768 P.2d 768

Thomas F. SPARKS, and Hermis E. Sparks and Charlotte A. Sparks, husband and wife, as the Natural Parents and Conservators of the Estate of Thomas F. Sparks, Plaintiffs-appellants,

v.

ST. LUKE'S REGIONAL MEDICAL CENTER, LTD., an Idaho corporation, Defendant-respondent.

No. 17067.

Supreme Court of Idaho.

Dec. 29, 1988.

Rehearing Denied Feb. 22, 1989.

---

Brady, Saetrum, Tingey, Day & Joyce, Michael G. Brady (argued), Boise, for plaintiffs-appellants.

Imhoff & Lynch, David R. Lombardi (argued), Boise, for defendant-respondent.

BAKES, Justice.

Appellants sued, *inter alia*, St. Luke's Regional Medical Center, Ltd. (St. Luke's), for medical malpractice in the treatment of Thomas F. Sparks (Sparks). The district court granted summary judgment in favor of St. Luke's because appellants "failed to put in the record their burden of responsibility showing controverted material facts," and "simply because there is no credible evidence in the record which supports allegations of negligence against the hospital." *Appellants* appeal, contending that genuine issues of material fact were raised. We affirm the summary judgment.

## I

Sparks was injured in an automobile accident on January 20, 1983. Two areas of medical care provided by St. Luke's form the basis for this action: (1) the surgery of January 21, 1983; and (2) the ventilator extubation and subsequent cardiac arrest on January 30, 1983.

### Surgery of January 21, 1983

As a result of the accident, Sparks had multiple internal injuries, including a torn thoracic aorta. The surgical repair of the torn aorta was undertaken by Doctors Orme and Barnes, both being board certified general and thoracic surgeons. In order to repair the torn aorta, it was necessary to cross-clamp it, both upstream and downstream from the tear. During the cross-clamping, all blood flow to the lower part of the body is interrupted, potentially causing serious damage.

Dr. Orme attempted to negate this problem and provide adequate profusion of blood by proper placement of a Gott shunt. The Gott shunt is simply a 9 mm. diameter hose. If the shunt operates properly, blood flows around the clamped-off portion of the aorta, supplying the lower part of the body, primarily the spinal cord.

One of the ways to monitor adequacy of the Gott shunt's performance is to watch urinary output. The absence of urine indicates inadequate blood and blood pressure. It was the acknowledged responsibility of Christine Gilliam, the St. Luke's operating room circulating nurse, to periodically post urine output measurements on a board adjacent to the operating table. The measurements would then be recorded on permanent hospital records. Sparks' urinary output registered essentially zero throughout the entire cross-clamping procedure. Nurse Gilliam testified that not only did she post Sparks' output every 15 minutes, but she also audibly announced it every time it registered zero. The readings were then permanently recorded in St. Luke's records.

According to the depositions of Doctors Orme and Barnes, neither recalled being told that Sparks' urinary output was essen-

tially zero, though Dr. Orme testified that even "[i]f they had [so informed me] I wouldn't have changed what I was doing." Sparks suffered paralysis immediately after the surgery.

### Ventilator extubation and subsequent cardiac arrest on January 30, 1983

Following the surgery, and while in the Intensive Care Unit (ICU), Sparks was intubated and breathed with the help of a respirator. During the morning of January 29th, the respirator setting was changed to let Sparks breathe completely on his own, even though the respirator's airway was still in place. After breathing on his own for approximately 25 hours, Sparks was put on a T-tube and studies were performed, including arterial blood gases (ABG) tests. The results of the studies were delivered to Dr. Orme, and he found them to be acceptable. Accordingly, Dr. Orme ordered Sparks extubated (removal of the breathing tube) at 12:10 p.m. on January 30, 1983. Although respiratory therapist Enloe and nurse Bodnar actually removed the endotracheal tube, they did not have the discretion to do so without a doctor's order. In fact, all changes in respiratory therapy were performed only by the physician or upon order of the physician.

After Sparks was extubated, Enloe provided respiratory therapy pursuant to Dr. Orme's orders, requiring intermittent positive pressure breathing (IPPB) or incentive spirometry every three hours. Since Sparks' efforts during the 1:30 p.m. incentive spirometry were "inadequate," Enloe decided to also give him an IPPB treatment (i.e., active inflation of the lungs while patient is inhaling). Enloe went off shift at 2:30 p.m. She was replaced by Diane Darnell, who offered no evidence for the record.

Gary Newhall was the ICU nurse who came on shift at approximately 3:00 p.m. Newhall stated that he noticed, sometime between 3:00 and 3:30 p.m., that Dr. Orme was in the ICU observing Sparks and that he spoke briefly with Dr. Orme concerning Sparks. Dr. Orme told Nurse Newhall that: (1) he was going to St. Alphonsus Hospital; (2) Dr. Orme had spoken with a hospital staff anesthesiologist, Dr. Tim Sullivan, and that in the event Sparks needed to be re-intubated, Dr. Sullivan would be available (though Dr. Orme did not tell Newhall how Dr. Sullivan was to be notified); and (3) there was a flexible bronchoscope at the bedside. Dr. Sullivan was aware that Sparks had been extubated earlier that day and Dr. Sullivan was present when the results of the 11:15 a.m. ABG's were shown to Dr. Orme.

At 4:00 p.m. Sparks complained of being hot, was found to have a temperature of 102.6° F. and a respiration rate of 36 breaths per minute (BPM). Repeat ABG tests were performed. Nurse Newhall reported the ABG's and Sparks' condition to Dr. Orme by telephone. Although there were indications that Sparks' condition was deteriorating, Dr. Orme chose not to re-intubate him. Instead he ordered a repeat ABG in one hour, a chest film at 6:00 p.m., and a modified IPPB treatment. Dr. Orme explained his decision not to re-intubate:

> "Because I felt that he was having mucus and thought that they could give him an IPPB treatment with a bronchodilator and Mucomyst, and that it would be reasonable to do that and see if it didn't improve. And he was stable at the time."

At 4:30 p.m. Sparks received the IPPB; yet 15 minutes later his skin was cool, clammy, pale colored, and Sparks complained of shortness of breath. At 4:50 p.m., Nurse Newhall again telephoned Dr. Orme and reported Sparks' deteriorating condition, including a decrease in blood pressure. An I.V. was started, but Sparks' blood pressure continued to decline. At 4:56 p.m., a decrease in Sparks' heart rate was noted, then his heart stopped. Cardiopulmonary resuscitation (CPR) was started immediately and, at 4:57 p.m., a Code Blue was called, "caus[ing]" nurse and anesthesia, other respiratory therapists to descend—other physicians to descend en masse to the patient's room or bedside" to render emergency aid.

Excerpts from the "nurse's notes" section of the "St. Luke's R+gional Medical Center Intensive Care Record Sheet" regarding Sparks are helpful in understanding how the events leading up to Sparks' cardiac arrest transpired.

10:10 a.m. Off respirator, on T-tube. Color pink. No respiratory distress noted.

12:00 noon No respiratory distress noted. Coughed up small amount thick yellow mucus. ABG's drawn at 12:30 —results called to Dr. Orme.

1:15 p.m. Patient turned to right side. Patient requested back onto back. Family in.

2:00 p.m. Playing cards with family. Treatments tolerated well. Spontaneous cough, throat suctioned for moderate amount white production.

4:00 p.m. Lab to draw ABG's. Patient alert and oriented, complained of being hot. I.V. infusing well. Extremities warm to touch.

4:30 p.m. IPPB tolerated very well. Stopped occasional for patient to cough. Orally suctioned approximately 10 cc thick creamy yellow production.

4:45 p.m. Skin cool and clammy, color pale. Patient complained of shortness of breath.

4:50 p.m. Dr. Orme notified of low blood pressure. One unit of plasmanate started. I.V. started. Decrease in blood pressure. Continued decrease in blood pressure.

4:56 p.m. Noted decrease in heart rate to 30–40, then asystole. CPR started.

4:57 p.m. Code blue called.

As a result of the cardiac arrest, Sparks sustained brain damage.

### Procedure

Sparks filed this action against Dr. Orme, Dr. Barnes, St. Luke's Hospital, and others. After extensive motions, affidavits, and depositions, Doctors Orme and Barnes settled with the plaintiff. St. Luke's defended, filing a motion for summary judgment supported by affidavits and depositions of various medical personnel involved in the administration and review of Sparks' treatment. Appellants opposed St. Luke's motion with the affidavit of David J. Cullen, M.D., a board certified anesthetist and intensivist at Massachusetts General Hospital and professor of anesthesia at Harvard Medical School.

The trial court granted St. Luke's motion for summary judgment. Appellants filed a motion for reconsideration and/or to defer entry of summary judgment. At the time this second motion was filed, additional depositions, including those of medical experts, had been filed with the court. Appellants' motion was heard, and the trial court filed a second memorandum decision and order denying appellants' motion for reconsideration. Appellants appeal the trial court's initial memorandum decision and order and the granting of judgment against them, as provided in the amended judgment and Rule 54(b) certificate filed July 27, 1987. We affirm.

### II

There is only one issue on appeal: does the record support the trial court's entry of summary judgment in favor of St. Luke's regarding both the January 21, 1983, surgery, and the January 30, 1983, cardiac arrest? We hold that it does.

The law applicable to this case has been previously stated on numerous occasions. I.R.C.P. 56(c) states, in part:

"Rule 56(c). Motion for summary judgment and proceedings thereon.... The judgment sought shall be rendered forthwith if the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."

Further, this Court recently set down guidelines in *Doe v. Durtschi*, 110 Idaho 466, 469, 716 P.2d 1238, 1241 (1986):

"When the motion is supported by depositions or affidavits, the adverse party 'may not rest upon the mere allegations or denials of his pleadings, but his response, by affidavits or as otherwise pro-

vided in this rule, *must set forth specific facts showing that there is a genuine issue for trial.'* I.R.C.P. 56(e)." (Emphasis added.)

The non-moving party's responsibility is further outlined in *Berg v. Fairman,* 107 Idaho 441, 444, 690 P.2d 896, 899 (1984):

"If a party resists summary judgment, *it is his responsibility to place in the record before the trial court the existence of controverted material facts* which require resolution by trial. A party may not rely on his pleadings nor merely assert that there are some facts which might or will support his legal theory, but rather he must establish the existence of those facts by deposition, affidavit, or otherwise. Failure to so establish the existence of controverted material facts exposes a party to the risk of a summary judgment." (Emphasis added.)

Recently, the United States Supreme Court explained the requirements of F.R.C.P. 56(c) in *Celotex Corp. v. Catrett,* 477 U.S. 317, 321–24, 106 S.Ct. 2548, 2552–2553, 91 L.Ed.2d 265 (1986):

"In our view, the plain language of Rule 56(c) *mandates* the entry of summary judgment, after adequate time for discovery and upon motion, *against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.* In such a situation, there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." (Emphasis added.)

*Accord Dekker v. Magic Valley Regional Medical Center,* 115 Idaho 332, 333, 766 P.2d 1213, 1214 (1988) ("Summary judgment is properly issued when the non-moving party bearing the burden of proof fails to make a showing sufficient to establish the existence of an element essential to that party's case."). One of the essential elements of plaintiffs' (here, the non-moving party) case is that it

"must, as an essential part of his or her case in chief, affirmatively prove by direct expert testimony and by a preponderance of all the competent evidence, that such defendant then and there *negligently failed to meet the applicable standard of health care practice of the community* in which such care allegedly was or should have been provided, as such standard existed at the time and place of the alleged negligence of such physician and surgeon, hospital or other such health care provider and as such standard then and there existed with respect to the class of health care provider that such defendant then and there belonged to and in which capacity he, she or it was functioning." I.C. § 6–1012 (emphasis added).

*Accord Dekker v. Magic Valley Regional Medical Center, supra* at 333, 766 P.2d at 1214 ("to preclude summary judgment in a medical malpractice case, it must be shown by expert testimony that there has been a negligent failure to meet the applicable standard of health care practice of the community."). We agree with the well reasoned opinion of the district court and affirm its holding that the plaintiffs here failed to put evidence showing controverted material facts regarding a breach of the standard of care in the record.

### *Surgery of January 21, 1983*

■ Appellants first contend that St. Luke's personnel did not meet the standard of care required of them during the operation of January 21, 1983. The record before us, however, adequately sets forth the applicable standard of care and demonstrates that the St. Luke's personnel involved in the surgery met that standard. Respondent's evidence in this regard is not controverted.

The standard of care applicable to St. Luke's operating room personnel is clearly set forth on numerous occasions in the record. First, St. Luke's written policy regarding "measuring urinary output in cardiovascular surgery" states the following:

"B. Recording Urinary Output in Cardiovascular Surgery.

1. At beginning of surgical procedure measure urine and rec°rd.

2. Each subsequent ½ hour measure & record on white board with waterproof pen the urine output.
3. Chart on the OPEN HEART—URINARY DATA SHEET, in ink, a permanent record of the chart.

"C. Charting urinary output on white data board.

1. Record time, amount & running total."

Defendants have put ample evidence in the record showing that this standard of care was met. Exhibit A to the affidavit of Chris Gilliam, dated February 4, 1987 is a copy of the "OPEN HEART—URINARY OUTPUT DATA SHEET" that was generated by St. Luke's personnel during the surgery. Nurse Gilliam testifed that either she or another St. Luke's nurse, Nurse Givens, completed the sheet. In addition, the other requirements of the applicable standard of care were met because, as Nurse Gilliam testified, she measured Sparks' urinary output and recorded it on the board in the surgery suite. In fact, Nurse Gilliam exceeded the standard of care on two counts: first, she measured the output not every one-half hour, but every one-quarter hour during the critical cross-clamping phase of the surgery; and second, even though the standard of care did not require it, she verbally announced her output measurements every time they registerd zero. In her affidavit, Nurse Gilliam stated:

"4. One of my responsibilities as circulating nurse during the surgery of January 21, 1983 upon plaintiff Thomas Sparks was to report and post urine output.

"5. I reported Mr. Sparks' urine output commencing approximately 5:30 a.m. until approximately 1:45 p.m. on January 21, 1983 during the surgery of that day involving plaintiff Thomas Sparks.

"6. I posted the urine output shown on Exhibit A attached hereto upon a board, in clear view, on the wall of the surgery suite at the intervals indicated on Exhibit A.

"7. At approximately 9:30 a.m. on January 21, 1983, when Mr. Sparks' urine output first registered zero, I started audibly announcing the fact that Mr. Sparks' urine output was zero in addition to making a written notation of zero on the board on the wall of the surgery suite.

"8. I audibly announced the fact that Mr. Sparks' urine output was zero on each and every occasion his urine output is indicated as zero on Exhibit A."

Nurse Gilliam's deposition is in accord:

"Q. [By plaintiff's counsel] All right. How was this sheet generated, do you know, as opposed to your putting the urinary outputs on the board?

"A. The time intervals are recorded on the board and then recorded on the sheet.
"Q. So, this is a copy of the board?
"A. Correct.
"Q. I see. And you were the one who was making the board?
"A. Correct.
"Q. Now, you stated in your affidavit that after the cross-clamping at approximately 09:03, the urinary output then, in the majority of instances in which it was measured and recorded, had dropped to 0.

"A. Correct.
"Q. And that you at that point not only wrote it on the board but you verbally announced that the urinary output was 0.
"A. Correct.

. . . .

"Q. And I'm correct from your affidavit that you announced it each and every time that you got that 0 figure; is that correct?
"A. Correct."

With this evidence, then, defendants not only established the standard of care applicable to St. Luke's personnel during the surgery, but also established that that

standard of care was met, and in fact, exceeded. As the party resisting summary judgment, it then became plaintiff's "responsibility to place in the record before the trial court the existence of controverted material facts which require resolution by trial." *Berg v. Fairman, supra* 107 Idaho at 444, 690 P.2d at 899. If plaintiffs do not meet that responsibility, then Rule 56(c) mandates the entry of summary judgment against them. *Dekker v. Magic Valley Regional Medical Center, supra.* Plaintiffs attempted to meet their responsibility by introducing the deposition testimony of Doctors Orme and Barnes.[1] Dr. Orme testified:

"Q. [By plaintiffs' counsel] Were you aware of these figures as they came out and Nurse Givens was recording them? Were you informed every 15 minutes of the fact that the urinary output was essentially 0?

"A. I don't recall that I was, and she—they may have informed me. If they had, I wouldn't have changed what I was doing."

The testimony of Dr. Barnes was similar:
"Q. Do you recall the nurse who was monitoring urinary output telling you or Dr. Orme that the urinary output had severely dropped off after the clamps were in place?
"A. I don't recall that detail, no."

This testimony by Doctors Orme and Barnes does not rise to the level sufficient to meet plaintiffs' "responsibility to place in the record before the trial court the existence of controverted material facts which require resolution by trial." *Berg v. Fairman, supra* at 444, 690 P.2d at 899.

Doctors Orme and Barnes did not question the fact that Sparks' urinary output data was posted and recorded as required by hospital rules. Rather, they only testified that they could not remember whether they were orally informed as to what the readings were. Neither doctor disputes that the output was measured and posted as required by the applicable standard of care; both doctors simply state that they just don't remember the audible announcement of the readings. Their testimony fails to establish a controverted material fact, *i.e.,* that St. Luke's failed to meet the applicable standard of care, as explained *supra.*

Neither does the affidavit of Dr. Cullen make a showing sufficient to establish a controverted material fact. His affidavit only states that "*if* Nurse Gilliam did not follow St. Luke's policies and procedures regarding the measuring and reporting and/or posting of urinary output in cardiovascular surgery, such conduct negligently failed to meet the applicable standards of health care practice...." (Emphasis added.) Further, he states that "St. Luke's personnel in Thomas Sparks' operating room on January 21, 1983, had the responsibility of measuring, reporting and/or posting urinary output, and this *may not* have been done." (Emphasis added.) These statements by Dr. Cullen do not establish the existence of a controverted material fact regarding the actions of St. Luke's personnel during the January 21, 1983, surgery. Rather, they only speculate as to what may or may not have been done. Further, in his later deposition, Dr. Cullen admits both that he is not familiar with the standard of care applicable in this situation and that the standard of care does not require audible announcement:

---

1. We note that plaintiffs have taken inconsistent positions regarding this issue at different times throughout the course of this action. In this appeal, plaintiffs assert that it was St. Luke's duty to make sure that Doctors Orme and Barnes were aware of the urinary output readings. However, when plaintiffs were yet pursuing their action against Dr. Orme, they took a different position. In plaintiffs' memorandum in opposition to defendant S. Kirby Orme, M.D.'s, motion for summary judgment, plaintiffs asserted that "*Dr. Orme had the duty* to

determine whether the Gott shunt was properly functioning, and to correct the lack of proper flow through the shunt. The improper placement, *monitoring* and correction of the Gott shunt by Dr. Orme resulted in spinal cord ischemia and permanent paralysis...." Thus, when pursuing their claim against Dr. Orme, plaintiffs asserted that it was Dr. Orme's duty, not the duty of St. Luke's, to monitor the performance of the Gott shunt, which monitoring was accomplished in part by watching the urinary output readings.

"Q. And at the time you signed this affidavit you also were not familiar with the standards of practice so far as they related to operating room and circulating nurses?

"A. Yes.

"Q. That is correct?

"A. Yes.

"Q. Are you aware of any hospital protocols, policies or procedures which were violated by the St. Luke's Regional Medical Center staff which resulted in any injury to Thomas Sparks?

"A. Could you show me two things. Do you have the documents—

"Q. You have them there.

"A. Do you have a document about the responsibility of the operating room nurses for the urine output?

"Q. It will be attached to the back of the Gilliam deposition.

"A. No. Not in regard to the operating room.

"Q. In fact that protocol doesn't even require audible announcement, does it?

"A. That's right. That's what I wanted to double check on."

Thus, defendant put in the record direct evidence that the standard of care was met. On the other hand, plaintiffs failed to introduce any evidence of a violation of the applicable standard of care. Plaintiffs were only able to put into the record evidence showing that Doctors Orme and Barnes did not remember the audible announcement. Accordingly, the trial court's entry of summary judgment regarding the

surgery of January 21, 1983, against plaintiffs was proper, and we affirm.

*Ventilator extubation and subsequent cardiac arrest on January 30, 1983*

█ The analysis applicable to the surgery of January 21, 1983, also applies to the ventilator extubation and subsequent cardiac arrest on January 30, 1983. Here again defendant has put into the record evidence of the applicable standard of care and evidence that it was met by St. Luke's personnel. Plaintiffs, conversely, contend that it was St. Luke's breach of the standard of care that caused Sparks' injuries.[2] Plaintiffs, however, have failed to carry their responsibility of placing in the record evidence showing that the standard of care was not met.

The record is replete with evidence indicating that the standard of care applicable to St. Luke's personnel regarding the ventilator extubation is simply to follow the attending physician's orders. In fact, as Dr. Cullen acknowledges, reprimands are issued when the doctor's orders are not followed. Both Dr. Merrick and Dr. Torrington, co-directors of the respiratory therapy department at St. Luke's, testified that the standard of care applicable to St. Luke's personnel was to follow the attending doctor's orders. Dr. Merrick stated that there is no national standard, but that it is the attending doctor's decision to put the patient back on a ventilator and only "in the unlikely situation that they [the hospital staff] had absolutely no medical direction at all or these

---

**2.** On this issue, too, plaintiffs have taken inconsistent positions in the past. Dr. Effler, a witness for plaintiffs possessing the same board certifications as Dr. Orme, testified that it was Dr. Orme's failure to meet the applicable standards (not St. Luke's failure) that caused Sparks' cardiac arrest. Specifically, Dr. Effler stated:

"[T]he lack of proper response by Dr. Orme to place Thomas Sparks back on respirator control ... failed to meet the applicable standard of health care practice [and] led directly to the cardiac arrest.... Dr. Orme had available to him a full respiratory therapy department, headed by physicians qualified in the *field* of respiratory diagnosis and treatment. Instead of utilizing their expertise, *Dr. Orme*

*undertook full responsibility for the post operative care of Thomas Sparks without consultation from this department and its physicians."*

Again, while pursuing their suit against Dr. Orme, plaintiffs stated that it was Dr. Orme's failure to meet the standard of care (not St. Luke's failure) which resulted in Sparks' cardiac arrest. In plaintiffs' memorandum in opposition to defendant S. Kirby Orme, M.D.'s, motion for summary judgment, plaintiffs argued that "Dr. Orme's failure ... to utilize the expertise of the hospital physicians qualified in the field of respiratory diagnosis and treatment, resulted in Mr. Sparks' cardiac arrest...."

represented any type of acute change, they are simply to say: Okay. Here are some things that may be of importance. You had better let the physician know about these."

"Q. Now if that person comes off a ventilator and these factors show up, these are the factors that you're using to say that they should be perhaps reintubated or put on a ventilator; is that correct?

"A. No, no, absolutely not.

"Q. What is—

"A. That is a physician's decision, to put the patient back on a ventilator.

. . . .

"Q. Now, Doctor, according to your guidelines, . . . and we have read that into the record, the policy procedure includes, number two, 'to initiate and monitor artificial ventilation.' Is that correct?

"A. It does say that.

"Q. That means that the respiratory therapists and nurses upon their own initiative, if they believe there is an acute situation, can initiate that kind of support; is that correct?

"A. You mean intubation and full ventilator?

"Q. They could actually call that anesthesiologist and get him over there stat and have him put on the ventilation—on a ventilator if they believed he was in dire straits; is that correct?

"A. I think if there was no one for them to talk to, if they could not reach the attending physician and, again, if it were dire straits—we're talking basically about a respiratory arrest level—then they could do that.

"Q. All right.

"A. Anything short of that, I would not expect that guideline to cover.

. . . .

"Q. BY [plaintiffs' counsel]: Should they have even waited to notify him [Dr. Orme] at 1645 with these further changes? In your opinion, was it per-

fectly acceptable for the persons observing him with all of these changes not to have notified that anesthesiologist to come over and at least evaluate him?

. . . .

"A. I don't think so. I think as long as they notified Dr. Orme and Dr. Orme responded to that notification, I see nothing at this point that would indicate any imminent demise of the patient on the basis of the information that you're asking me to assume.

. . . .

"Q. Now wait a minute, Doctor. The physician involved here was not present. He was notified. These are guidelines to your respiratory therapists and nurses and they were there. And of those six guidelines, four out of six are present. Shouldn't that nurse and that respiratory therapist, either one, call that anesthesiologist to come see that patient right now?

"A. No. What these guidelines state is that the attending physician should be informed of these changes. And the attending physician is the one who has collated all this material.

. . . .

"Q. And have you formed an opinion concerning the care and treatment that was given Thomas Sparks concerning his ventilatory care and treatment post operatively?

"A. I have.

"Q. And what is that opinion?

"A. That opinion is that it was appropriate and met the standards of care for this community."

As the district judge noted, Dr. Torrington, likewise, stated that "the standard of care of the respiratory therapist is to call the attending physician when the therapist or nurse is concerned or of the belief that the person should be re-intubated to a ventilator." Dr. Torrington further testified:

"Q. Do the therapists have an independent ability if they think something is acutely changed and they believe that

patient should be intubated, do they, through your service, have an independent ability to call somebody stat like the anesthetist on call?

"A. They really don't. The mechanism would be if the patient is having a cardiac or respiratory arrest, the mechanism of involving anesthesia would be by calling the code blue, the respiratory or cardiac arrest situation, which would cause nurse and anesthesia, other respiratory therapists to descend—other physicians to descend en masse to the patient's room or bedside.

"Q. Does the situation always have to go to a code before they would call somebody for intubation?

"A. No. If the therapist or nurse is extremely concerned about the patient, they would call the attending physician. They certainly don't wait until the patient has arrested before letting anybody know. They are in contact with the physician who is attending on the patient."

Sybil F. Roberts Enloe, respiratory therapy coordinator for the ICU. Critical Care Unit (CCU) and Pediatric Intensive Care Unit (PICU) at St. Luke's, testified that all ventilator changes are done under the direction of the attending physician. When questioned about weaning patients from a respirator, she stated, "We don't do any of it independent of a physician's orders," and that "it all goes back to being under the auspices of the physician. They are the ones that determine the weaning criteria or the weaning method." Mrs. Enloe testified further:

"Q. Insofar as any changes that occurred in respiratory therapy concerning Mr. Sparks, were all of these changes only performed by the orders of the physician or by the physician?

"A. Yes.
"Q. You didn't independently, or your department didn't independently, change anything?

"A. No, not to my knowledge."

Next, as plaintiffs' witness, Dr. Cullen, testified, he contacted Dr. Lunn, an anesthesiologist at St. Alphonsus Hospital, in order to familiarize himself with the standard of practice in Idaho. In his own deposition, Dr. Cullen testified as follows:

"I asked him [Dr. Lunn] what criteria does a respiratory therapist and ICU nurse need to proceed on weaning and extubation. Did they depend on a physician's order or are there general standards.
"Q. What did he tell you?
"A. Generally based on a physician's order.

. . . .

"... [H]e would expect them to recognize the need for reintubation but he would expect this would all be done through the physician. He wouldn't expect them to do it on their own.
"Q. It would require a physician's order?
"A. Yes.

. . . .

"That he would expect when the physician knows—basically once they have informed the physician, their responsibility has completed itself with that, and they received the order from the physician. That wouldn't be any different in Idaho than some other part of the country that he's aware of. That's what he would expect people in other parts of the country to do as well."

Finally, plaintiffs attempted to meet their responsibility of placing in the record the existence of controverted material facts by relying on the opinion testimony of Dr. Cullen himself. That reliance, however, is misplaced because Dr. Cullen, too, recognized the above stated standard of care and that that standard of care was met by St. Luke's personnel. In his deposition,[3] Dr. Cullen testified as follows:

---

3. We base our analysis on Dr. Cullen's deposition, rather than his affidavit filed earlier, because Dr. Cullen admits that he was unaware of

"I got the feeling that the authority—particular surgeons at this hospital [St. Luke's] keep very tight control over their patients, and the respiratory therapists and the nurses don't seem to choose to deviate outside of that degree of authority.

"Q. And that's the standard of care?

"A. That's the standard of care that they are using at that hospital.

. . . .

"Q. Do you agree with me that the St. Luke's Regional Medical Center staff followed the orders given to them by the treating physicians in this case?

"A. Yes.

"Q. Do you agree with me that following the orders of the treating physicians in this case by the St. Luke's Regional Medical Center staff was consistent with the standard of care?

"A. Yes.

. . . .

"Q. This is not a case where the hospital staff fell below the applicable standard of care because they failed to recognize an obvious error on the part of the treating physician and get another physician to come in and replace that order with a different order?

"A. No. As I understand the standard of care at St. Luke's, that really would never occur and I couldn't expect the St. Luke's staff to make an end run around

Dr. Orme. It suggests something—I know you're not suggesting that I wouldn't expect them to do that.

. . . .

"Q. ... It is my understanding from your testimony today that you would not require or the standard of care does not require St. Luke's to procure a qualified staff physician to attend to Thomas Sparks in the absence of the treating physician; is that correct?

"A. That's correct. Actually the last few depositions that just came in to me on Friday clarified that issue of what the relationship of the thoracic surgery group was to the pulmonary medicine group and the practice patterns of that group. So I had—I was not aware of that at the time I signed that.

. . . .

"Q. You are aware of no violation of hospital protocols, policies, or procedures by the hospital staff which resulted in any injury to Mr. Sparks?

"A. That's right."

■ Thus, the record shows that defendants (the party moving for summary judgment) put into the record not only evidence regarding the standard of care applicable to the ventilator extubation and subsequent hospital care, but also evidence that the standard of care was met.[4] In fact, that

the applicable standard of care at the time he signed his affidavit:

> "Q. Dr. Cullen. Just to clarify some confusion that I have between what you have said in the affidavit filed in response to St. Luke's motion for summary judgment and what you have said here today, in paragraph 8 of your affidavit you state: 'By not measuring, reporting and/or posting Thomas Sparks' urinary output during the surgery of January 21, 1983, and by not adequately monitoring Thomas Sparks post-operatively and recognizing his respiratory distress and/or procuring a qualified staff physician to attend to Thomas Sparks when respiratory orders were known to be inadequate on January 30, 1983, St. Luke's operating room intensive care unit and the respiratory therapy consistently failed to meet the applicable standards of health care practice'—et cetera.
>
> "It is my understanding from your testimony today that you would not require or the stan-

dard of care does not require St. Luke's to procure a qualified staff physician to attend to Thomas Sparks in the absence of the treating physician; is that correct?

> "A. That's correct. Actually the last few depositions that just came in to me on Friday clarify that issue of what the relationship of the thoracic surgery group and the pulmonary medicine group and the practice patterns of that group. So I had—I was not aware of that at the time I signed that.
>
> "Q. At the time you signed this affidavit you really weren't familiar with the standards of practice as they existed in Boise, Idaho in that particular instance; isn't that correct?
>
> "A. That's correct."

4. The facts and the outcome of the instant case are in accord with the involuntary dismissal granted the defendant hospital in *Butler v. Caldwell Memorial Hospital,* 90 Idaho 434, 412 P.2d 593 (1966). In *Butler,* the plaintiff had been

evidence came from defendants' and plaintiffs' witnesses alike. With that evidence in the record, and after defendants moved for summary judgment, it became plaintiffs' "responsibility to place in the record before the trial court the existence of controverted material facts which require resolution by trial." *Berg v. Fairman, supra* at 444, 690 P.2d at 899. Plaintiffs, however, did not meet their responsibility. Their primary witness, Dr. Cullen, recognized that the standard of care regarding the extubation and subsequent hospital care was met by St. Luke's personnel. His only criticism of St. Luke's staff was that they did not go *beyond* their authority as determined by the applicable standard of care in this case. After acknowledging that the standard of care only required St. Luke's personnel to follow the attending doctor's orders, Dr. Cullen testified as follows:

"Q. What are the specific items where the St. Luke's Regional Medical Center staff fell below the standard of care on January 30, 1983?

"A. The only specifics that I can refer to have to do with—it's implied to me or actually stated to me in Mr. Newhall's deposition [which is not in the record on appeal] that Dr. Orme told him that he had notified an anesthesiologist who was available to reintubate the patient if that became necessary. Therefore my criticism of Gary Newhall would be that he didn't notify the anesthesiologist to reintubate Mr. Sparks until it was too late and that notification should have come earlier than it did.

"Q. Is that your only criticism of all of the ICU and respiratory therapy personnel care on January 30, 1983? That's the one specific item where the St. Luke's Regional Medical Center staff fell below the applicable standards of care?

"A. Yes."

Dr. Cullen's criticism of Nurse Newhall for not notifying an anesthesiologist to re-intubate Sparks goes beyond the standard of care and assumes facts of which Dr. Cullen had no knowledge. As Dr. Cullen admitted:

"I also had assumed there was somebody else in the hospital who would be able to intubate this patient, a nurse anesthetist or whoever intubates the patient.

"Q. Your assumption was not based on any facts of which you are aware; is that correct?

"A. Yes."

Dr. Cullen himself acknowledged that he would not expect St. Luke's personnel to "make an end run around Dr. Orme." Yet the record clearly shows that Nurse Newhall was in continuing contact with Dr. Orme, informing him of Sparks' situation, and receiving Dr. Orme's instructions. The last phone consultation with Dr. Orme was only six minutes before Sparks arrested. To argue that Nurse Newhall should have sought out another hospital staff physician to change Dr. Orme's instructions would not only violate the applicable standard of care for Nurse Newhall, but suggests that the nurse was better qualified to evaluate the needs of the patient than Dr. Orme— essentially an exercise in hindsight.[5] Fur-

---

injured when she fell out of her hospital bed onto the floor. Plaintiff alleged that the hospital was negligent in failing to place restraints on her, or in failing to provide her with continuous supervision which would have prevented her fall, even though neither of these measures was ordered by the treating physician. These allegations were made even though the hospital had "strictly complied" with all of the treating physician's orders. Both of plaintiff's treating physicians testified that the imposition of restraints was a decision left solely to the treating physician and that neither the nurses nor the hospital attendants had any authority to decide when or if restraints should be used. In holding that the hospital was not negligent in its care of the plaintiff, this Court stated:

"Thus, we find no evidence in the record of negligence on the part of the hospital nurses or attendants. If there was negligence in the failure to provide a special nurse, or constant supervision, or to apply restraints, such would not be negligence on the part of the hospital in view of the orders given by the attending physician and the undisputed evidence that such precautions were within the ambit of the doctor's authority and responsibility, not that of the hospital." 90 Idaho at 440–441, 412 P.2d at 596.

**5.** In fact, the record demonstrates that even if Nurse Newhall had sought out another physician, Dr. Orme's instructions may not have been altered. After being taken step by step through

ther, as Dr. Cullen acknowledged in his deposition, "the standard of care does not require St. Luke's to procure a qualified staff physician to attend to Thomas Sparks in the absence of the treating physician...." There is no evidence in the record to show the existence of a controverted material fact regarding whether the St. Luke's staff *met* the applicable standard of care.

Even though Dr. Cullen states that he has only one criticism of Nurse Newhall in that he did not notify the anesthesiologist to re-intubate Sparks, later in his deposition Dr. Cullen states that he actually has a second criticism:

"Q. Are you aware of any instance where the St. Luke's Regional Medical Center staff did not follow or properly execute an order from the physicians who were responsible for Mr. Sparks' care?

"A. I would say no with this proviso: That I didn't review every order. It may have happened but I don't think anything relevant—the items we're talking about.

"Q. Given the facts in this case, am I correct in understanding that the standards of care would not have required any of the St. Luke's Regional Medical Center staff to ignore or question any of the orders given by the treating physicians?

"A. Let me answer it this way: *I think the staff should have questioned Dr. Orme's request for IPPB at 4:20 in the afternoon by saying that they think this patient should be reintubated with a PO 2 of 42* and all of the clinical context that I am sure we'll be getting into; *I think it is fair for them to have*

the events which transpired on the afternoon of January 30, 1983, Dr. Merrick testified as follows:

"Q. ... Now you are notified at 1630 of this additional information, of the temperature, the respiratory rate up to 36, the arterial blood gas down to 42. And you, according to Mr. Harris—and I don't believe I'm misquoting the deposition—he said that an anesthesiologist had actually been called and asked to be on call to reintubate in case it was needed. "Now taking all those facts into account and you're called and given this information, would you have at least asked that anesthesiologist to come see that patient right then and there?

. . . .

"A. I would not.
"Q. What is the reason you would not?"
"A. I still don't have any information, from what you've asked me to assume anyway, any information that this patient is critically deteriorated. And I don't—and an anesthesiologist does not know the case as well as I do. I don't think an anesthesiologist can give me any help that the respiratory therapist and nurse couldn't. And the respiratory therapist and nurse has already, or one or both of them, has already reported to me what the patient's clinical condition was. And I don't think that I would ask the anesthesiologist to see the patient under those circumstances.

. . . .

"Q. Doctor, at 1645 the patient now further showed, 'Skin cool and clammy. Color pale. Patient complains short of breath. Dr. Orme notified and he was out of the hospital.'

"Now, Doctor, do you believe there are indications that the people who are seeing him with this further deterioration, with those blood gases, that temperature, this respiratory rate, and the fact that he's now getting cool and clammy and pale and the patient is complaining of shortness of breath, in your opinion, do you believe that they should have called that anesthesiologist to at least come over and look at him stat? ... In your opinion, was it perfectly acceptable for the persons observing him with all of these changes not to have notified that anesthesiologist to come over and at least evaluate him?

. . . .

"A. I don't think so. I think as long as they notified Dr. Orme and Dr. Orme responded to that notification, I see nothing at this point that would indicate any imminent demise of the patient on the basis of the information that you're asking me to assume.

"Q. So you think with all of these indications there was no way you could anticipate that from 1645, that 12 minutes later he was going to arrest?

"A. I do not think so.

"Q. And when they notified Dr. Orme of low blood pressure yet at 1650 and he was out of the hospital, would you also now with that additional information not have called the anesthesiologist stat?

"A. I would not have.

"Q. And there's no way with all of these changes that you would anticipate this man might arrest very shortly?

"A. There is not."

*questioned that order."* (emphasis added).

However, it is well documented in the record that the standard of care for Nurse Newhall was to *follow* the treating physician's orders, not to question or countermand them. As with the decision to re-intubate, the issue in this case is whether plaintiffs placed in the record evidence of a controverted material fact regarding whether St. Luke's personnel met the applicable standard of care; the issue does not revolve around whether St. Luke's personnel should have exceeded their authority as determined by the applicable standard of care.

These two criticisms, both suggesting that the hospital staff should have exceeded their authority, are the only criticisms Dr. Cullen had of the St. Luke's staff. He testified:

"Q. Other than the two items that we have discussed, the shared responsibility to call for reintubation and the questioning or discussion at the time of the IPPB, is there any other instance where the staff of St. Luke's Regional Medical Center fell below the applicable standards of care on January 30, 1983?

"A. No, I think we have talked about the response to the phone call and we have talked about the events between 4:20 and 4:50 and the continued deterioration. Those two events are the only criticisms I would have of your staff."

Accordingly, regarding both the surgery of January 21, 1983, and the ventilator extubation of January 30, 1983, the defendant hospital put into the record evidence that it's staff met the applicable standard of care in support of its motion for summary judgment. With that done, it then became plaintiffs' "responsibility to place in the record before the trial court the existence of controverted material facts which require resolution by trial." *Berg v. Fairman, supra* at 444, 690 P.2d at 899. We have carefully reviewed the record, and we agree with the trial court that plaintiffs "failed to put in the record their burden of responsibility showing controverted materi-

al facts" regarding either incident under consideration. Accordingly, "the plain language of Rule 56(c) mandates the entry of summary judgment." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). *Accord Dekker v. Magic Valley Regional Med. Center,* 115 Idaho 332, 766 P.2d 1213 (1988).

The decision and judgment of the trial court are affirmed. Costs to respondents. No attorney fees were requested.

SHEPARD, C.J., and McFADDEN, J. pro tem., concur.

HUNTLEY, Justice, dissenting.

I must respectfully dissent because the summary judgment was not properly granted in view of facts and inferences which require resolution by a jury. My restatement of the facts and the appellate ruling which should flow therefrom follows. We should more carefully resist the temptation to invade the province of Idaho juries.

Sparks brought suit alleging medical malpractice in the treatment rendered to Sparks at St. Luke's. Two areas of medical care provided by St. Luke's form the basis for this action. The first allegation of negligent care concerns whether the nurses properly performed their duties and informed the surgeons of low or non-existent urine output during an operation on Thomas Sparks on January 21, 1983. The second allegation of negligence against the hospital concerns the treatment given by the hospital on January 30, 1983. The respiratory therapists and nurses employed by St. Luke's allegedly failed to perform their duties in the evaluation and care given to Sparks during the morning and afternoon hours of January 30, 1983, prior to his cardiac arrest.

St. Luke's brought a motion requesting summary judgment on all Sparks' claims against the hospital. The district court granted summary judgment in favor of St. Luke's on all claims, concluding that, as to the first allegation of negligence, Sparks "failed to put in the record their burden of responsibility showing controverted materi-

al facts." The district court stated that its ruling was warranted as to the second allegation of negligence "simply because there is no credible evidence in the record which supports allegations of negligence against the hospital." Sparks appeals contending that genuine issues of material fact were raised on both claims and that, therefore, the district court's ruling was in error.

In reviewing the motion for summary judgment, the district court correctly acknowledged that it was bound to follow the guidelines issued by this Court in *Doe v. Durtschi,* 110 Idaho 466, 716 P.2d 1238 (1986). In *Doe v. Durtschi,* this Court stated:

> A motion for summary judgment is proper only when 'there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.' I.R.C.P. 56(c). When the motion is supported by depositions or affidavits, the adverse party 'may not rest upon the mere allegations or denials of his pleadings, but his response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial.' I.R.C.P. 56(e). The latter requirement, however, does not change the standards applicable to the summary judgment motion. *Central Idaho Agency, Inc. v. Turner,* 92 Idaho 306, 310, 442 P.2d 442, 446 (1968). Those standards require the district court, and this Court upon review, to liberally construe the facts in the existing record in favor of the nonmoving party, and to draw all reasonable inferences from the record in favor of the nonmoving party. *Anderson v. Ethington,* 103 Idaho 658, 660, 651 P.2d 923, 925 (1982). In this process the Court must look to the 'totality of the motions, affidavits, depositions, pleadings, and attached exhibits,' not merely to portions of the record in isolation.

*Doe v. Durtschi, supra,* pages 469–470, 716 P.2d 1238.

With regard to a motion for summary judgment in a medical malpractice case, in *Maxwell v. Women's Clinic, P.A.,* 102 Idaho 53, 56, 625 P.2d 407 (1981) this Court stated:

> Therefore, in order to preclude summary judgment in medical malpractice cases, plaintiffs must show that expert testimony has been *offered* by either the plaintiff or defendant which when viewed in a light most favorable to plaintiffs indicates that the defendant has negligently failed to meet the applicable standard of health care practice of the community.

(Quoted with approval in *Pearson v. Parsons,* 114 Idaho 334, 757 P.2d 197 (1988) and *Dekker v. Magic Valley Regional Medical Center,* 115 Idaho 332, 766 P.2d 1213 (1988). *See also,* sections 6–1012 and 6–1013, *Idaho Code,* (setting forth the proof of community standard of health care practice in a malpractice case and the requisite testimony of an expert witness on community standard).

Both sides submitted depositions and affidavits in support of their position on the motion for summary judgment. Although the district court correctly identified the *Doe v. Durtschi, supra,* standard as controlling its ruling on the motion for summary judgment, it failed to correctly apply that standard and, as a result, its ruling was in error on both claims of negligent medical care. I first address the treatment rendered Sparks by St. Luke's during the surgery of January 21, 1983 and then discuss the treatment rendered Sparks by St. Luke's during the morning and afternoon hours of January 30, 1983 prior to his cardiac arrest.

### *Surgery of January 21, 1983*

As a result of the accident, Sparks had multiple internal injuries, including a torn thoracic aorta. The surgical repair of the torn aorta was undertaken by Doctors S. Kirby Orme and Robert P. Barnes, both being board certified general and thoracic surgeons. In order to repair the torn aorta, it was necessary to cross-clamp it both upstream and downstream from the tear. During the cross-claiming, all blood flow to the lower part of the body is interrupted, potentially causing serious damage.

Dr. Orme attempted to negate this problem and provide adequate profusion of blood by proper placement of a Gott shunt. The Gott shunt is simply a 9 millimeter diameter hose. If the shunt operates properly, blood flows adequately to protect the lower part of the body, primarily the spinal cord.

One of the ways to monitor the Gott shunt's performance is to watch urinary output. The absence of urine indicates inadequate blood and blood pressure. It was the acknowledged responsibility of Christine Gilliam, the St. Luke's operating room circulating nurse, to periodically report and post urine output on a board in the surgery suite. Sparks' urinary output registered essentially zero throughout the entire surgical procedure. Nurse Gilliam submitted an affidavit to the district court in which she claimed that she audibly announced the urine output every 15 minutes and, in addition, wrote it on the surgery suite board.

According to the depositions Doctors Orme and Barnes submitted to the district court, neither recalled being told that Sparks' urinary output was essentially zero. Dr. Orme testified in his deposition that even "[i]f they had [so informed me] I wouldn't have changed what I was doing." Sparks suffered paralysis immediately after the surgery.

Sparks opposed St. Luke's motion with the affidavit of David J. Cullen, M.D., a board certified anesthetist and intensivist at Massachusetts General Hospital and professor of anesthesia at Harvard Medical School. Dr. Cullen's expert medical opinion regarding the case was that "St. Luke's Operating Room, Intensive Care Unit, and Respiratory Therapy Department negligently failed to meet the applicable standards of health care practice in the Boise, Idaho medical community in January 1983."

Viewed in conjunction, the affidavit of Dr. Cullen and the depositions of Doctors Orme and Barnes constitute sufficient evidence supporting the claim of negligent care in the surgery of January 21, 1983 to meet the standards applicable to a summary judgment motion. As stated in *Doe v.*

*Durtschi, supra,* those standards require the district court, and the Supreme Court upon review, to liberally construe the facts in favor of the non-moving party, to accept as true fact allegations contained in the non-moving party's affidavit, and to draw all reasonable inferences from the record in favor of the non-moving party.

The record before the district court contained the testimony of each of the surgeons, Doctors Orme and Barnes, that they did not remember having been informed of the urinary output. This Court considers it reasonable to infer that the surgeons were not so informed since they testified they did not remember being informed. Such inference would be in conflict with Nurse Gilliam's affidavit stating that she did audibly announce the output every 15 minutes and, thus, raises a genuine issue as to a question of fact.

Whether the doctors were informed is a material question. Sparks suffered paralysis after the surgery. During the surgery he exhibited indicia of inadequate blood and blood pressure which may not have been made known to his surgeons. The materiality of the fact placed in issue by the inference reasonably drawn from the surgeon's deposition testimony is demonstrated by the testimony of Dr. Cullen. In his affidavit, Cullen states that "[i]f Nurse Gilliam did not follow St. Luke's policies and procedures regarding the measuring and reporting and/or posting of urinary output in cardiovascular surgery, such conduct negligently failed to meet the applicable standards of health care practice for operating room personnel as they existed in Boise, Idaho in January 1983." Notwithstanding Dr. Orme's cavalier statement that he would not have changed his procedures even if he had been aware of the absence of urinary output, there is no evidence in the record showing that Dr. Barnes, the assistant surgeon, had he been adequately informed, would not have taken corrective action so as to ensure adequate blood flow.

Viewing all facts in the record in favor of Sparks, as dictated by the standards for summary judgment, we should conclude that an order granting summary judgment to St. Luke's on this issue was in error.

*Evaluation and care prior to Sparks' cardiac arrest on January 30, 1983*

Following the surgery, and while still in the ICU, Sparks was intubated and breathed with the help of a respirator. During the morning of January 29, the respirator setting was changed from "intermittent mandatory ventilation" (IMV), which requires the machine to breathe a set number of breaths but also lets the patient breathe on his own, to a setting known as "continuous positive airway pressure" (CPAP), which requires the patient to breathe on his own exhaling against a pressure present in the airway at all times with the respirator's airway remaining in place. After Sparks breathed with the respirator on CPAP mode for a time, Dr. Orme ordered Sparks extubated (removed) at 12:10 p.m. on January 30, 1983.

Prior to the January 30th extubation Sparks was tried off the respirator and put on a T-tube. Studies were performed, including arterial blood gasses (ABG) tests, and Enloe was responsible to return Sparks to the respirator if he did not tolerate his trial off the respirator. The results of the studies were delivered to Dr. Orme and he found them to be acceptable. The findings, however, indicated respiratory fatigue and, therefore, should have created concern given the circumstances of this case. According to Dr. Cullen's affidavit, given Sparks' size and general medical condition, the fact of respiratory fatigue should have been recognized as a problem since he had been removed from respiratory support. Additionally, the measurements should have been serially observed, but were not until 4:00 p.m. that day.

After Sparks was extubated, Enloe provided respiratory therapy pursuant to Dr. Orme's orders, requiring intermittent positive pressure breathing (IPPB) or incentive spirometry every three hours. Since Sparks' efforts during the 1:30 p.m. incentive spirometry were "inadequate," Enloe decided to also give him a nonordered IPPB treatment. Enloe went off shift at 2:30 p.m. She was replaced by Diane Darnell, who offered no evidence for the record.

Gary Newhall was the ICU nurse who came on shift at approximately 3:00 p.m.

Newhall stated that he noticed that sometime between 3:00 and 3:30 p.m. Dr. Orme was in the ICU observing Sparks. Newhall further stated that he spoke briefly with Dr. Orme concerning Sparks. Dr. Orme informed Newhall that Dr. Tim Sullivan, an anesthesiologist, was on call in the event that Sparks would need to be reintubated and that there was a flexible bronchoscope at the bedside.

At 4:00 p.m. Sparks complained of being hot and was found to have a temperature of 102.6 degrees and a respiration rate of 36 breaths per minute (BPM). Repeat ABG tests still showed unacceptable results. Dr. Orme was advised of the ABG and chose not to reintubate Sparks. Instead he ordered a repeat ABG in one hour, a chest film at 6:00 p.m., and a modified IPPB treatment. Dr. Orme explained his decision not to re-intubate:

> Because I felt that he was having mucus and thought that they could give him an IPPB treatment with a bronchodilator and Mucomyst, and that it would be reasonable to do that and see if it didn't improve. And he was stable at the time.

At 4:30 p.m. Sparks received the IPPB. Ten minutes later Sparks' skin was cool, clammy and pale colored and he complained of shortness of breath. Sparks arrested at approximately 4:57 p.m. and a Code Blue was called. As a result of the cardiac arrest, Sparks sustained severe and permanent brain damage.

Despite Sparks' acknowledged abnormal ABG, and rapidly deteriorating respiratory condition, Newhall did not contact Dr. Tim Sullivan, the anesthesiologist who had been designated by Dr. Orme as being on call in the event that Sparks would need to be re-intubated. Newhall did not undertake any measures to ventilate or re-intubate Sparks even though there was a flexible bronchoscope at Sparks' bedside. Rather, Newhall simply stood by and watched Sparks go into cardiac arrest without any active medical intervention.

In his affidavit, Dr. Cullen opined that "[o]n January 30, 1983, St. Luke's nursing and respiratory therapy personnel assigned to care for Thomas Sparks either knew that Dr. Orme's respiratory orders for Thomas

522

Sparks were inadequate and/or failed to recognize Thomas Sparks' desperate respiratory distress." According to the policies and procedures of St. Luke's concerning the Respiratory Therapy Department and Department of Nursing in effect in January 1983, representatives from both these departments had the responsibility of checking Sparks' tolerance to being removed from the respirator. In his affidavit, Dr. Cullen concludes that:

> [B]y not adequately monitoring Thomas Sparks postoperatively and recognizing his respiratory distress and/or procuring a qualified staff physician to attend to Thomas Sparks when the respiratory orders were known to be inadequate on January 30, 1983, St. Luke's Operating Room, Intensive Care Unit, and Respiratory Therapy Department negligently failed to meet the applicable standards of health care practice in the Boise, Idaho medical community in January 1983.

Enloe's deposition, Newhall's affidavit and Cullen's affidavit together constitute sufficient material in the record to give rise to serious questions regarding the evaluation and care given Sparks prior to his cardiac arrest on January 30, 1983. Thus, the record before the district court upon ruling on St. Luke's motion for summary judgment should have indicated the presence of a genuine issue of material fact. That issue is whether St. Luke's personnel adequately monitored and reported Sparks' medical condition postoperatively and recognized Sparks' respiratory distress and/or procured a designated anesthesiologist to attend to Sparks, when respiratory orders were known (or in the exercise of reasonable care conceivably should have been known) to be inadequate due to the rapidly failing condition which ultimately resulted in Sparks' cardiac arrest.

Therefore, we should hold that the district court's ruling as to the second claim of negligent care was also in error.

JOHNSON, J., concurs.