808 P.2d 851

**G&M FARMS, a partnership,
Plaintiff–Appellant,**

v.

**FUNK IRRIGATION COMPANY, Lindsay Manufacturing Company, and De-Kalb Agresearch, Inc., corporations,
Defendants–Respondents.**

**FUNK IRRIGATION COMPANY,
Counterclaimant,**

v.

**G&M FARMS, a partnership,
Counterdefendant.**

No. 18136.

Supreme Court of Idaho,
Boise, February 1990 Term.

March 19, 1991.

Green, Service, Gasser & Kerl, Pocatello, for plaintiff-appellant. James B. Green, Pocatello, argued.

Elam, Burke & Boyd, Boise, for defendants-respondents Lindsay and DeKalb. Bobbi K. Dominick, Boise, argued.

Quane, Smith, Howard & Hull, Boise, for defendant-respondent Funk Irr. Allyn L. Sweeney, Boise, argued.

BOYLE, Justice.

In this appeal from entry of a partial summary judgment, we are called upon to determine whether the trial court correctly ruled that plaintiff failed to establish a prima facie case on the claims for intentional and negligent misrepresentation.

The plaintiff-appellant, G & M Farms, is the purchaser of an agriculture irrigation system manufactured by the defendant-respondent Lindsay Manufacturing Company and distributed by Lindsay's co-defendant-respondent, Funk Irrigation. According to the record, G & M Farms began negotiating in the summer of 1984 with Funk Irrigation and Lindsay Manufacturing for the purchase of a Lindsay Generation II Zimmatic three-quarter mile wide lateral move pipeline irrigation system. In July of 1984, a purchase order was prepared by Funk Irrigation, but it was never signed by either party. In August, 1984 James O'Cilka, a Lindsay representative, visited G & M Farms' property to inspect the lay of the land to determine the suitability of this particular system for G & M Farms' use. The record demonstrates that O'Cilka represented to G & M Farms that the machine was suitable for the proposed site and that it would work on that particular terrain. Subsequent to this meeting, and relying on the representations of O'Cilka, G & M Farms agreed to purchase and install the Lindsay Generation II system. A second purchase order was prepared and signed by G & M Farms on October 17, 1984 and a third purchase order, intended to modify the contract price, was prepared in December, 1984, but was never signed.

The Lindsay irrigation system was installed and operational by June, 1985, however G & M Farms asserts that throughout the 1985 crop season it repeatedly malfunctioned, broke down and stopped operating, requiring numerous repairs and modifications. Plaintiff alleged that these numerous malfunctions resulted in an insufficient water supply to G & M's crops causing crop losses.

On October 7, 1985, G & M Farms notified Funk Irrigation that it was revoking acceptance of the Lindsay irrigation system and the following January filed this action for economic loss against Funk Irrigation, Lindsay Manufacturing and DeKalb Agresearch, Inc., parent corporation of Lindsay Manufacturing. G & M Farms seeks to hold the defendants liable for the amount paid for the irrigation system, for economic loss damages resulting from crop loss and for incidental losses relating to the deficiencies of the irrigation system. G & M Farms bases its claims for damages on the theories of breach of contract, breach of express and implied warranties, negligent design and manufacture, and intentional and negligent misrepresentation.[1] Funk Irrigation counterclaimed for the balance of the purchase price.

The trial court granted a partial summary judgment in favor of the defendants on the negligent and intentional misrepresentation claims and the negligent design and manufacture claim. The trial court's basis for granting the partial summary judgment on the negligent manufacturing claim was that a plaintiff is prohibited from recovering purely economic losses in a products liability action sounding in tort. The partial summary judgments on the intentional and negligent misrepresentation claims were granted on the basis that G & M Farms failed to establish a prima facie case supported by clear and convincing evidence. G & M Farms appeals from the trial court's entry of summary judgment against it on the claims for negligent and intentional misrepresentation. These issues were certified as final pursuant to I.R.C.P. 54(b) and are thus appealable. *Walker v. Shoshone County*, 112 Idaho 991, 739 P.2d 290 (1987).

The primary issue presented in this appeal is whether the trial court erred in granting the respondents' motion for summary judgment on the claims for negligent and intentional misrepresentation.

## I.

### *Standard of Review*

■ It is well established that "[A] motion for summary judgment shall be rendered forthwith if the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and

---

1. Plaintiff's complaint alleges economic loss as a result of reduced crop yield, however, property damage is not alleged or sought in plaintiff's complaint.

that the moving party is entitled to judgment as a matter of law." I.R.C.P. 56(c); *Olson v. Freeman*, 117 Idaho 706, 791 P.2d 1285 (1990); *Rawson v. United Steelworkers of Am.*, 111 Idaho 630, 726 P.2d 742 (1986); *Boise Car & Truck v. Waco*, 108 Idaho 780, 702 P.2d 818 (1985); *Schaefer v. Elswood Trailer Sales*, 95 Idaho 654, 516 P.2d 1168 (1973). Upon a motion for summary judgment, all controverted facts are liberally construed in favor of the non-moving party. *Tusch Enters. v. Coffin*, 113 Idaho 37, 740 P.2d 1022 (1987); *Doe v. Durtschi*, 110 Idaho 466, 716 P.2d 1238 (1986); *Kline v. Clinton*, 103 Idaho 116, 645 P.2d 350 (1982). Likewise, all reasonable inferences which can be made from the record shall be made in favor of the party resisting the motion. *Tusch Enters. v. Coffin*, 113 Idaho 37, 740 P.2d 1022 (1987); *Doe v. Durtschi*, 110 Idaho 466, 716 P.2d 1238 (1986); *Meridian Bowling Lanes, Inc. v. Meridian Athlete Ass'n, Inc.* 105 Idaho 509, 670 P.2d 1294 (1983); *Anderson v. Ethington*, 103 Idaho 658, 651 P.2d 923 (1982); *Kline v. Clinton*, 103 Idaho 116, 645 P.2d 350 (1982). The burden at all times is upon the moving party to prove the absence of a genuine issue of material fact. *Petricevich v. Salmon River Canal Company*, 92 Idaho 865, 452 P.2d 362 (1969). However, the plaintiff's case must be anchored in something more than speculation and a mere scintilla of evidence is not enough to create a genuine issue. *Id. See also Nelson v. Steer*, 118 Idaho 409, 797 P.2d 117 (1990). If the record contains conflicting inferences or reasonable minds might reach different conclusions, a summary judgment must be denied. *Kline v. Clinton*, 103 Idaho 116, 645 P.2d 350 (1982); *Farmer's Ins. Co. of Idaho v. Brown*, 97 Idaho 380, 544 P.2d 1150 (1976). All doubts are to be resolved against the moving party, and the motion must be denied if the evidence is such that conflicting inferences may be drawn therefrom, and if reasonable people might reach different conclusions. *Doe v. Durtschi*, 110 Idaho 466, 716 P.2d 1238 (1986); *Ashby v. Hubbard*, 100 Idaho 67, 593 P.2d 402 (1979).

█ However, in cases such as the instant action, where the standard of proof required of the plaintiff at trial is clear and convincing evidence, we have been urged to adopt a standard which would require the trial courts to take that quality and quantity of evidence into account when ruling on motions for summary judgment. The position urged by respondents is based on an extension of the standard adopted in defamation cases in *Weimer v. Rankin*, 117 Idaho 566, 790 P.2d 347 (1990), and *Anderson v. Liberty Lobby*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In defamation cases clear and convincing evidence is required at trial and the question on summary judgment is whether the record discloses evidence such that a jury applying the clear and convincing standard could reasonably find for the plaintiff. *Anderson v. Liberty Lobby, id.; Weimer v. Rankin, id.*

In *Nelson v. Steer*, 118 Idaho 409, 797 P.2d 117 (1990), an action which alleged interference with contract and breach of fiduciary duty, we cited *Anderson v. Liberty Lobby* for the well-established summary judgment principles that it is not the trial court's function to weigh the evidence, but to determine whether there is a genuine issue for trial. There is no issue for trial unless there is sufficient evidence favoring the non-moving party for a jury to return a verdict for that party, and that summary judgment should be granted if the evidence in opposition to the motion is merely colorable or is not significantly probative. 118 Idaho 409, 410, 797 P.2d 117, 118. As will be discussed below, the evidence submitted by G & M Farms in opposition to respondents' motions for summary judgment is not merely colorable, but rather is significantly probative and is sufficient to withstand entry of summary judgment particularly where the evidence in the record is not applied nor considered under a clear and convincing evidence standard.

Our citation to *Anderson v. Liberty Lobby* in *Nelson v. Steer* was intended for the purpose relating to those summary judgment principles discussed in *Nelson*. By our citation to *Liberty Lobby* in *Nelson v. Steer*, we did not intend therein to adopt a clear and convincing evidence standard in

summary judgment proceedings in all cases where the burden of proof at trial is by clear and convincing evidence.

Therefore, for reasons set forth and discussed hereinafter, we decline to extend the elevated summary judgment burden of proof established in *Weimer v. Rankin* and *Anderson v. Liberty Lobby* in defamation cases to the summary judgment proceedings on the legal theories presented in the instant appeal. Rather, the traditional I.R.C.P. 56(c) summary judgment principles and standards govern the granting of summary judgment on the issues of fraud and intentional misrepresentation.

## II.

### Dismissal of Intentional Misrepresentation Claim

In its complaint appellant G & M Farms alleges intentional misrepresentation by defendants Lindsay Manufacturing and De-Kalb Agresearch, Inc. G & M Farms asserts that Lindsay Manufacturing and De-Kalb Agresearch, Inc., falsely represented that the Generation II system possessed the capacity and operational capability to meet the general and special needs of G & M Farms and failed to disclose facts known exclusively by the defendants concerning the expected problematic performance of this particular system. The appellant bases its claim on four statements made by the representatives of Lindsay Manufacturing. These include representations that (1) the irrigation system "would work"; (2) there were "thousands of these machines around"; (3) Lindsay had experienced "great success" with this irrigation system and that Lindsay had received "no complaints"; and (4) G & M Farms were "the only ones having problems."

 To establish actionable fraud, also referred to as intentional misrepresentation, a plaintiff must prove the following elements:

> (1) a representation; (2) its falsity; (3) its materiality; (4) the speaker's knowledge of its falsity or ignorance of its truth; (5) his intent that it should be

acted on by the person and in the manner reasonably contemplated; (6) the hearer's ignorance of its falsity; (7) his reliance on the truth; (8) his right to rely thereon; and (9) his consequent and proximate injury.

*Tusch Enters. v. Coffin,* 113 Idaho 37, 41, 740 P.2d 1022, 1026 (1987); *Faw v. Greenwood,* 101 Idaho 387, 613 P.2d 1338 (1980); *Smith v. King,* 100 Idaho 331, 597 P.2d 217 (1979); *Mitchell v. Siqueiros,* 99 Idaho 396, 582 P.2d 1074 (1978). The party alleging fraud must support the existence of each of the elements of the cause of action for fraud by pleading with particularity the factual circumstances constituting fraud. I.R.C.P. 9(b); *Theriault v. A.H. Robins,* 108 Idaho 303, 307, 698 P.2d 365, 369 (1985); *Galaxy Outdoor Advertising v. Idaho Transp. Dep't,* 109 Idaho 692, 710 P.2d 602 (1985); *see Witt v. Jones,* 111 Idaho 165, 722 P.2d 474 (1986). Furthermore, the party alleging an action for fraud has the burden of proving all these elements at trial by clear and convincing evidence. *Faw v. Greenwood,* 101 Idaho 387, 613 P.2d 1338 (1980); *Smith v. King,* 100 Idaho 331, 597 P.2d 217 (1979); *Gneiting v. Clement,* 96 Idaho 348, 528 P.2d 1283 (1974).

In its memorandum decision and order, the trial court observed that the parties did not dispute that Lindsay's representative made the four statements alleged to be misrepresentations, and then analyzed each statement separately to determine whether the statement demonstrated a sufficient basis for proof of fraud. Upon review we must also determine whether the defendants' statements provide the basis for a claim of intentional misrepresentation, and whether the record supports the trial court's determination that there are no genuine issues of material fact and that the respondents were entitled to judgment as a matter of law.

### A. Representations Made By Lindsay

1. Representation That The Irrigation System "Would Work."

 G & M Farms contends that in August, 1984, James O'Cilka, a Lindsay repre-

sentative, visited G & M Farms' property to inspect the lay of the land and to determine the suitability of the Generation II irrigation system for G & M's purposes. In his deposition, Gary Funk, a partner in G & M Farms, stated that he asked O'Cilka if the irrigation system would cover the necessary ground and supply sufficient water. O'Cilka's reply was "yes it will work." Mr. Funk stated that he relied on O'Cilka's judgment because he was the factory representative and because O'Cilka stated that they had "thousands" of these machines, that they were a "great success," and were operating with no customer complaints.

As evidence that these representations were false, and that the respondents had knowledge of their falsity, G & M Farms placed into the record two indemnity agreements entered into between Lindsay Manufacturing and Funk Irrigation. In addition to the indemnity agreements, deposition testimony regarding mechanical failures with other Generation II systems was presented to the trial court.

The first indemnity agreement presented by G & M Farms was entered into between Lindsay and Funk on August 22, 1984 and pertained to the purchase of two Lindsay Generation II three-quarter-mile lateral move irrigation systems. This indemnity agreement was entered into after G & M Farms started its negotiations with Funk for the purchase of the irrigation system, but more than a month *prior* to G & M Farms signing the October, 1984 purchase order agreement with Lindsay. This indemnity agreement (contained as Attachment A in the addendum to this opinion) stated that the Lindsay Generation II was not designed for the length required by Funk Irrigation and that there existed certain operational characteristics of the equipment which had not been corrected and which may cause the system to misalign and shut down. The indemnity agreement further stated, "Lindsay is willing to sell the same to Funk only upon condition that Funk indemnify and hold harmless Lindsay from any claim of damages that may result from the above ..." Gordon Toevs, manager for Funk Irrigation, stated in his deposition that the two machines

referred to in the first indemnity agreement applied to two three-quarter-mile wide machines which had been ordered for the Behrend farm located next to G & M Farms. Toevs stated in his deposition that Lindsay would not sell the machines to Funk Irrigation without the indemnity agreement because Lindsay was concerned it did not have sufficient experience with three-quarter mile wide irrigation machines. Toevs also stated in his deposition that at the time he signed the first indemnity agreement, he was of the understanding that this was a "blanket" agreement for any over-length system that Funk Irrigation would subsequently purchase from Lindsay.

The second indemnity agreement was entered into between Lindsay and Funk Irrigation in January, 1985 (contained as Attachment B in the addendum to this opinion). This indemnity agreement pertained to the actual machine sold to G & M Farms and expressly stated that Lindsay did not recommend the system, that it was not designed for the three-quarter mile length requested by Funk, and that its length may cause the system to misalign and shut down. This agreement also stated that Lindsay would sell the system only if Funk Irrigation agreed to indemnify and hold harmless Lindsay from any claims for damages.

G & M Farms asserts that at no time did a Lindsay representative inform G & M Farms that the Generation II system was not designed for the three-quarter mile length or that the system possessed certain operational characteristics which may affect its operation under normal operating conditions. G & M Farms contends that it was not aware that Lindsay personnel would be unavailable to work on this system which Lindsay knew would not operate or function properly. G & M Farms argues that these two indemnity agreements clearly established at the time of the sale negotiations and at the time the purchase contract was signed that Lindsay knew that the system was not operational. G & M Farms further argues that Lindsay intentionally misrepresented and failed to dis-

close material information regarding that fact.

With regard to O'Cilka's statement to Gary Funk that the Generation II three-quarter mile length irrigation system "would work," the trial court held:

[T]here are disputed issues of fact concerning some of the elements of misrepresentation. For example, there is evidence in the record that the representation was made, that it was material to the plaintiff's decision to purchase the irrigation system, and that it was made with the intent that it should be acted upon by the plaintiff. Likewise the indemnification agreement between Lindsay and Funk Irrigation dated January 29, 1985 contained statements indicating that the defendants knew that the system would not work and that their statements to the contrary were false. In short, there are issues of fact which would, under most circumstances, preclude the granting of summary judgment. However, the weakness of the plaintiff's claim is that representation is only actionable if it relates to an existing or past fact. The courts have consistently held "that a representation consisting of a promise or statement as to a future event will not serve as a basis for fraud, even though it was made under circumstances of knowledge and belief which would give rise to an action for fraud had it related to an existing or past fact." *Sharp v. Idaho Inv. Corp.*, 95 Idaho 113, 505 [504] P.2d 386 (1972).

Citing *Tusch Enters. v. Coffin*, 113 Idaho 37, 740 P.2d 1022 (1987), G & M Farms concede that O'Cilka's representation that the system "would work" pertains in part to the future, but argues that the representations also touch on past and existing facts and events. G & M Farms contend that the failure to disclose known facts concerning the problematic design and the likely malfunctioning of the irrigation system falls within the category of intentional misrepresentation cases based on nondisclosure of material information. We agree.

In *Tusch Enters. v. Coffin*, 113 Idaho 37, 41, 740 P.2d 1022, 1026 (1987), this Court held that an intentional misrepresentation or fraud claim should not be analyzed only with reference to the elements recited in *Faw v. Greenwood*, 101 Idaho 387, 613 P.2d 1338 (1980). We stated in *Tusch* that the facts of that case fell within the category of misrepresentation on the basis of nondisclosure. 113 Idaho at 41–42, 740 P.2d at 1026–27. The plaintiff in *Tusch Enterprises* was a purchaser of several duplexes and the defendants were the respective builder and vendor of the duplexes. The vendor stated that the buildings were of "good quality construction." It was later shown that the buildings had been constructed on fill dirt which eventually settled and caused the foundations and walls to crack. Tusch Enterprises submitted proof that it was not told of the fill dirt conditions or of possible problems with the foundations. We held that the vendor should have disclosed the latent fill dirt problems and that Tusch Enterprises was entitled to rely upon the vendor's representation that the dwellings were well constructed. The trial court's entry of summary judgment against Tusch Enterprises was reversed on the fraud claim, and the case was remanded for trial.

In *Bethlahmy v. Bechtel*, 91 Idaho 55, 415 P.2d 698 (1966), a home builder failed to disclose to a purchaser the presence of an unsealed irrigation ditch running beneath the garage of the house which, in conjunction with the fact that the basement was not of waterproof construction, caused seepage into the basement during the irrigation season. We held in *Bethlahmy* that the failure to disclose these major defects which were known to the defendants and unknown to the plaintiffs, and not discoverable upon reasonable inspection, supported a finding of fraud.

In the instant case, for purposes of creating genuine issues sufficient to withstand summary judgment, the indemnity agreements support the claim that Lindsay Manufacturing was aware of defects with the irrigation system it was selling to G & M Farms. Although the first indemnity agreement, which was entered into prior to the sale of the irrigation system to G & M

Farms, does not refer to the actual machine sold to G & M Farms, it does pertain to the same model machine and system sold to G & M Farms. In the first indemnity agreement, as well as the January, 1985 agreement, Lindsay expressly states that the machine is not designed for the three-quarter mile length, and that there are operational characteristics which are likely to cause the machine to malfunction. These operational characteristics and the design limitations constitute, for purposes of summary judgment proceedings, hidden conditions or defects similar in nature to those presented in *Tusch Enterprises* or *Bethlahmy.*

Fraud may be established by silence where the defendant had a duty to speak. *Chiarella v. United States,* 445 U.S. 222, 100 S.Ct. 1108, 63 L.Ed.2d 348 (1980); *see also Tusch Enters. v. Coffin,* 113 Idaho 37, 740 P.2d 1022 (1987) (failure to disclose may amount to a misrepresentation); *Bethlahmy v. Bechtel,* 91 Idaho 55, 415 P.2d 698 (1966) (failure to disclose may amount to a misrepresentation); *Jones v. Majestas,* 108 Idaho 69, 696 P.2d 920 (Ct. App.1985) (fraud may be established by silence where information to be conveyed is not already in possession of other party). A duty to speak arises in situations where the parties do not deal on equal terms or where information to be conveyed is not already in possession of the other party. *Jones v. Maestas,* 108 Idaho 69, 696 P.2d 920 (Ct.App.1985); *see also Sorenson v. Adams,* 98 Idaho 708, 571 P.2d 769 (1977) (silence in circumstances where a prospective purchaser might be led to harmful conclusion is a form of "representation").

In the instant case the indemnity agreements in the record demonstrate that Lindsay knew that the Generation II machine ordered by G & M Farms was not designed for the three-quarter mile length as required by G & M Farms. The indemnity agreements also indicate that Lindsay knew that the Generation II three-quarter mile irrigation system possessed certain operational characteristics which might cause it to malfunction or shut down under normal operating conditions. Knowledge of

these operational and design defects was known only to Lindsay and discoverable by G & M Farms only after purchase and installation of the extensive irrigation system. Under these circumstances the inference can be drawn that G & M Farms and Lindsay were not dealing on equal terms. Consequently, for purposes of our review on summary judgment, Lindsay had a duty to disclose that the system was not designed for the length required by G & M Farms and that the system was likely to malfunction or shut down under normal operating conditions. Such information was material to G & M Farms' decision to purchase the irrigation system. "Materiality refers to the importance of the misrepresentation in determining the plaintiff's course of action." *Edmark Motors, Inc. v. Twin Cities Toyota,* 111 Idaho 846, 727 P.2d 1274 (Ct.App.1986). This information, if known to G & M Farms, may well have induced G & M Farms to refrain from purchasing the machine which would have resulted in Lindsay losing the $425,000.00 sale. Instead, Lindsay representatives assured G & M Farms that the system would work. G & M Farms had the right to rely on the manufacturer's representation that the machine would perform the job for which it was purchased. As evidence of reliance, Gary Funk stated in his deposition that he had received a bid from another dealer, Lockwood, that was approximately $20,000.00 to $50,000.00 less expensive than the Funk Irrigation bid. Notwithstanding the lower bid, the record supports an inference that G & M Farms accepted Funk Irrigation's bid because it had been assured by Lindsay representatives that the three-quarter mile linear system would work, whereas Lockwood would not make a similar guarantee.

A liberal construction of the facts contained in the record, and drawing all reasonable inferences in favor of G & M Farms as the non-moving party, demonstrates the existence of genuine issues of material fact sufficient to withstand granting of summary judgment. Lindsay's failure to disclose that the machine was not designed for the length required and that it possessed operational characteristics which

had not been corrected and which would likely cause the machine to shut down, are latent defects and material to a decision to purchase the machine. Clearly, if true, Lindsay had a duty to divulge this information to G & M Farms prior to it entering into a contractual agreement for the purchase of such machine. *Tusch Enters. v. Coffin*, 113 Idaho 37, 740 P.2d 1022 (1987); *see also Bethlahmy v. Bechtel*, 91 Idaho 55, 415 P.2d 698 (1966). The indemnity agreements in the record demonstrate Lindsay's knowledge of those latent defects. Hence, there exist genuine issues of material facts which preclude granting of summary judgment on the intentional misrepresentation claim against Lindsay Manufacturing and DeKalb, Inc.

2. Representation That There Were "Thousands of These Machines Around."

In August, 1984 when O'Cilka inspected the farm, the record clearly reveals that he represented to Gary Funk that there were "thousands of these machines around." Gary Funk testified in his deposition that he understood this to mean linear machines and, being assured by O'Cilka that there were many of these machines in use and operative, made him comfortable about purchasing the Lindsay system. However, it was only after the system was installed and experiencing substantial mechanical failures did Funk learn that there were only twenty-five or thirty linear machines in operation and only five three-quarter mile machines, including the one installed on G & M Farms' property.

In its memorandum decision and order, the trial court held that G & M Farms had not presented evidence establishing that the representation that there were "thousands of these machines around" was false and that the speaker knew of its falsity. In addition, the trial court held that the evidence did not establish that this statement was material to, or that G & M Farms had relied upon the truth of this statement in deciding to purchase the Lindsay system. The trial court stated that the statement can best be viewed simply as "puffing" or "sales talk" and therefore not actionable.

We disagree. Although the general rule with regards to "trade talk," "dealer's talk," "puffing," and "seller's talk," is that such statements do not amount to actionable misrepresentation, this rule is not applicable where the parties to the transaction do not stand on equal footing or have equal means of knowing the truth. *Weitzel v. Jukich*, 73 Idaho 301, 251 P.2d 542 (1952). O'Cilka represented to G & M Farms that there were thousands of the machines in use like the one being sold to them. However, it appears from our review of the record that there were only twenty-five or thirty, if it was Generation II machines that were being referred to, or as few as four irrigation systems if the reference applied to the three-quarter mile machine. There is a substantial difference between a representation that thousands of these machines exist versus the reality of somewhere between four and thirty of the systems in operation. Such a statement, for purposes of summary judgment proceedings, does not constitute mere sales talk or puffing and may give rise to an award of damages. The representation that thousands of these machines exist may also have been taken as an indication of the machine's quality and reliability which is material to the decision to purchase a $450,000.00 irrigation system. Based on our review of the entire record and the facts in this case we conclude, for summary judgment purposes, that the representation "there are thousands of these machines around" is not mere puffing or sales talk and may be the basis for a claim for intentional misrepresentation.

The well-established standards governing motions for summary judgment require that all reasonable inferences drawn from the statements be construed in favor of the nonmoving party. *Tusch Enters. v. Coffin*, 113 Idaho 37, 740 P.2d 1022 (1987); *Doe v. Durtschi*, 110 Idaho 466, 716 P.2d 1238 (1986); *Meridian Bowling Lanes, Inc. v. Meridian Athlete Ass'n, Inc.*, 105 Idaho 509, 670 P.2d 1294 (1983). Thus, when construed in favor of the nonmoving party we reasonably infer that O'Cilka's statement referred to the Generation II

Lateral Move Irrigation System. In conjunction with the other statements and representations made by the defendants, we hold that the statement "there are thousands of these machines around" creates a genuine issue of fact and supports G & M Farms' claim of intentional misrepresentation sufficient to withstand entry of summary judgment.

3. Representation That The System Was A "Great Success" And That There Have Been "No Complaints."

G & M Farms contends that Lindsay was aware of the falsity of this representation due to the complaints of other purchasers and dealers. G & M Farms further maintains that the Generation II linear machine was an experimental machine, not proven technology, and that Lindsay had an obligation to inform G & M Farms of this prior to the sale. In support of its claim, G & M Farms heavily relies on similar problems experienced with the Generation II system by an Arizona farmer named Raymond Clayton. However, the trial court held that "a single instance of problems with linear irrigation systems which were ultimately resolved and involved different problems does not provide a basis for showing that the Lindsay representatives knew that their representations were false, particularly when such knowledge must be shown by clear and convincing evidence." As support for its claim, G & M Farms cites to deposition statements made by Pat Hennesy, Jr., a Lindsay manufacturer's representative, concerning the nine Generation II irrigation systems sold in Arizona to Clayton. Hennesy testified that Clayton had originally contracted to purchase Generation I machines but, as a result of Lindsay's urging, Clayton agreed to accept Generation II machines. Hennesy states in his deposition that the nine machines sold to Clayton in mid–1983, were the first Generation II systems sold and following installation there were numerous problems with the machines which were so severe as to require repair and maintenance personnel on site at all times in order to keep the machines running. Hennesy also testified in his deposition that during this period of time there were dealer council meetings, the focus of which was the Generation II machine, apprising Lindsay of extensive field problems with this particular irrigation system.

Gary Funk testified in his deposition that he personally traveled to Arizona and visited Clayton's farm. Funk stated that he talked with a foreman working on Clayton's farm who told him about the machine's many mechanical failures and the problems they encountered in keeping the irrigation systems running. Funk also testified that he talked with an irrigation system dealer in Arizona who commented that the Clayton installation was somewhat of an experimental situation to see how the Generation II's would perform. Funk testified in his deposition that he spoke with several other Arizona irrigation system dealers who told him that they had experienced numerous problems with the Generation II system, and that another Arizona farmer told him that his Lindsay Generation I system had worked adequately but that he had experienced significant problems with the Generation II linear machine. Funk also testified in his deposition that he spoke with a past president of the Lindsay Dealers Council who told him of a former employee of DeKalb who quit because he would not sell farming equipment he believed would not work. Funk testified that he was told by Hennesy that the Generation II machines in California had just as many problems as those experienced by G & M Farms and that Lindsay should have researched its machine more thoroughly before marketing it. According to Funk, Hennesy also told him that Lindsay was trying to keep the problems with the Generation II quiet because there was interest in the machines from consumers in South Africa and Australia.

The foregoing deposition testimony is cited to demonstrate the extensive troubled history of the Generation II irrigation system which was contained in the record. The statements by Funk with regard to what was told to him by various individuals not employed by defendants is hearsay and therefore inadmissible to prove the falsity

of the statements that the irrigation systems were a "great success" with "no complaints". However, Pat Hennesy, Jr.'s statements regarding the Generation II machines installed on Clayton's farm are admissible evidence. Based on the evidence of known, extensive problems set forth in the record, we disagree with the trial court's conclusion that "a single instance of problems with linear irrigation systems [machines on Clayton's farm] which were ultimately resolved and involved different problems does not provide a basis for showing that the Lindsay representatives knew their representations were false."

At the time the Generation II equipment was installed on Clayton's Arizona farm, the record indicates that his nine irrigation systems were the only Generation II machines in existence. Thus it is axiomatic that G & M Farms relies heavily on the problems experienced by Clayton to demonstrate Lindsay's knowledge of the mechanical failures associated with Generation II machines. Although the mechanical failures experienced by Clayton were not identical to those experienced by G & M Farms, the problems encountered were sufficiently similar and equally as severe. Like G & M Farms, Clayton's problems were so severe as to require repair personnel on the farm at all times just to keep the machines operating. The record before us leads to the inference that Lindsay was aware of these mechanical problems since it was often Lindsay's personnel making the repairs on Clayton's machinery. Furthermore, Lindsay was aware of the operational problems as a result of the dealer council meetings which provided input from various manufacturer's representatives concerning the problematic performance of the Generation II machines. The fact that mechanical problems on Clayton's machines were ultimately repaired is irrelevant. What is relevant, however, is Lindsay's knowledge prior to, and at the time of, the G & M Farms transaction that problems existed and until they were repaired, the irrigation system machine was not going to work properly and as a result G & M Farms was risking crop damage. Viewing this evidence in a light most favorable to the plaintiffs, we hold that genuine issues of material fact exist as to whether the defendants knew their representations regarding the irrigation system were false.

**B.** *Summary Judgment Should Not Have Been Granted On Intentional Misrepresentation*

■ Although the standard for summary judgment was previously discussed in Part I, the issues presented in this action warrant further discussion. If uncontroverted facts exist which lead to a definite disposition as a matter of law, summary judgment is appropriate. *Kline v. Clinton*, 103 Idaho 116, 645 P.2d 350 (1982); *Smith v. Boise Kenworth Sales, Inc.*, 102 Idaho 63, 625 P.2d 417 (1981). Controverted facts are viewed in favor of the party resisting the motion for summary judgment. *Tusch Enters. v. Coffin*, 113 Idaho 37, 740 P.2d 1022 (1987); *Doe v. Durtschi*, 110 Idaho 466, 716 P.2d 1238 (1986). It is well established that the non-moving party is entitled to the benefit of every reasonable inference that can be drawn from the evidentiary facts. *Anderson v. Ethington*, 103 Idaho 658, 651 P.2d 923 (1982); *Kline v. Clinton*, 103 Idaho 116, 645 P.2d 350 (1982); *Taylor v. Choules*, 102 Idaho 222, 628 P.2d 1056 (1981). "The burden of the plaintiff when faced with a motion for summary judgment, is not to persuade the judge that an issue will be decided in his favor at trial. Rather, he simply must present sufficient materials to show that there is a *triable* issue." *Earl v. Cryovac, a Div. of W.R. Grace*, 115 Idaho 1087, 1093, 772 P.2d 725, 731 (Ct.App.1989), citing 6 J. Moore, W. Taggart & J. Wicker, *Moore's Federal Practice* § 56.11(3), at pp. 56–243 (2d ed. 1988) (emphasis original). "A triable issue exists whenever reasonable minds could disagree as to the material facts or the inferences to be drawn from those facts. *E.g., Earl v. Cryovac, a Div. of W.R. Grace*, 115 Idaho 1087, 772 P.2d 725 (Ct.App.1989); *Petricevich v. Salmon River Canal Co.*, 92 Idaho 865, 452 P.2d 362 (1969). Summary judgment is improperly granted where any genuine issue of

material fact remains unresolved. *Kline v. Clinton*, 103 Idaho 116, 645 P.2d 350 (1982); *Taylor v. Choules*, 102 Idaho 222, 628 P.2d 1056 (1981). If the record contains conflicting inferences or reasonable minds might reach different conclusions, a summary judgment must be denied. *Kline v. Clinton*, 103 Idaho 116, 645 P.2d 350 (1982); *Farmer's Ins. Co. of Idaho v. Brown*, 97 Idaho 380, 544 P.2d 1150 (1976).

A review of the entire record and the evidence presented to the trial court supports an inference that the Generation II lateral move irrigation system was, as the appellant argues, a prototype and not proven technology. Accordingly, if proven to be true, Lindsay had a duty to disclose this information to G & M Farms prior to it purchasing the system. Furthermore, Lindsay clearly had a duty to disclose the fact that the irrigation system installed on G & M Farms' property was not designed for the three-quarter mile length. In construing the evidence in the record most favorable to G & M Farms, and giving it the benefit of all favorable inferences which may be drawn therefrom, there is ample evidence for summary judgment purposes to support each element of the prima facie case necessary for the theory of intentional misrepresentation. In our view of the record, reasonable minds could easily differ regarding these factual issues. We conclude that genuine issues of material fact exist regarding G & M Farms' claim that Lindsay Manufacturing and DeKalb Agresearch failed to disclose material information regarding the Generation II lateral move irrigation system prior to the purchase of the system by G & M Farms. We reverse the trial court's grant of summary judgment against the defendants Lindsay Manufacturing and DeKalb Agresearch on this issue and remand for trial.

In the instant case, the trial court relied on the case of *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986), when it granted the defendant's motion for summary judgment on the intentional misrepresentation claim. Specifically, the trial court stated,

> In reviewing the defendant's motion, the court notes that the plaintiff must establish its fraud claims by clear and convincing evidence (citation omitted), and that this elevated standard of summary proof must be taken into account in ruling on the defendant's summary judgment motion. The court's inquiry must be whether the record discloses evidence such that a jury applying the clear and convincing standard could reasonably find for the plaintiff.

In *Anderson v. Liberty Lobby*, the United States Supreme Court held in a defamation case involving a public figure or public official in which actual malice must be proved, that the clear and convincing standard of proof should be taken into account in ruling on summary judgment motions. We adopted that standard in *Weimer v. Rankin*, 117 Idaho 566, 790 P.2d 347 (1990), which was also a defamation case. However, although this elevated standard applies in the context of defamation cases, it is not necessary in fraud or intentional misrepresentation actions that the clear and convincing standard of proof required at trial be taken into account as the standard in ruling on a motion for summary judgment.

In *Kline v. Clinton*, 103 Idaho 116, 645 P.2d 350 (1982), this Court was required to review the granting of partial summary judgment in a case dealing with an oral modification of a written agreement. The trial court granted the defendant's summary judgment motion on the basis that the plaintiffs were unable to show by clear and convincing evidence the terms of the oral agreement. We reversed the trial court's decision and held,

> While proof of an oral modification by *clear and convincing evidence* is the *appropriate burden* of proof *at the trial* of a matter, at the *summary judgment* stage the function of the trial court is not to weigh the evidence or to try the factual issues by whatever standard is appropriate to the case, but merely to determine whether or not there exists any *genuine issue of material fact* as adduced from the entire record.

*Id.* at 103 Idaho 121, 645 P.2d at 355. (Emphasis added.)

In *Collord v. Cooley,* 92 Idaho 789, 451 P.2d 535 (1969), the defendants' motion for summary judgment was granted. On appeal the respondents argued that summary judgment was properly granted because the plaintiffs had failed to come forward with clear and convincing evidence to establish the existence of a contract to make a will. Referring to respondent's position, the Court stated, "[t]his argument, however, misconstrues the role of a summary judgment. The burden is upon the party moving for summary judgment—the respondents here—to establish that there is no genuine issue of material fact. (Quoting from 6 *Moore's Federal Practice,* § 56.15[3], pp. 2335–2336 (2d ed. 1966), the Court then stated,

> The courts hold the movant to a strict standard. To satisfy his burden the movant must make a showing that is quite clear what the truth is, and that excludes any real doubt as to the existence of any genuine issue of material fact.

92 Idaho at 795, 451 P.2d at 541.

In the instant case, when considered in light of the traditional standards applicable to summary judgment, the record contains controverted facts upon which reasonable minds might reach different conclusions. A review of the entire record and the evidence presented to the trial court in light of that standard could support a conclusion that the Generation II lateral move irrigation system was, as the appellant argues, a prototype and not proven technology and not designed for the three-quarter mile length or terrain. If proven to be true at trial, Lindsay had a duty to disclose this information to G & M Farms prior to it purchasing the system.

Respondents urge that application of the principles first established by the United States Supreme Court in *Celotex v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986), and thereafter adopted by this Court in *Olsen v. J.A. Freeman Co.,* 117 Idaho 706, 791 P.2d 1285 (1990); *Sparks v. St. Luke's Regional Medical Center, Ltd.,* 115 Idaho 505, 768 P.2d 768

(1988); *Dekker v. Magic Valley Regional Medical Center,* 115 Idaho 332, 766 P.2d 1213 (1988); *Badell v. Beeks,* 115 Idaho 101, 765 P.2d 126 (1988), requires affirming the entry of partial summary judgment. We disagree. The principle established in *Celotex* and its progeny simply establishes that the language of Rule 56 requires entry of summary judgment after adequate time for discovery against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case and in which that party will bear the burden of proof at trial. *Celotex v. Catrett,* 477 U.S. at 321–25, 106 S.Ct. at 2552–53, 91 L.Ed.2d at 272–75. *See also Olsen v. Freeman,* 117 Idaho at 720–21, 791 P.2d at 1299–300, and *Badell v. Beeks,* 115 Idaho at 102, 765 P.2d at 127. In construing the evidence in the record most favorably to G & M Farms, and giving it the benefit of all favorable inferences which may be drawn therefrom, there is evidence to support each element of the prima facie case necessary for the theory of intentional misrepresentation.

We therefore conclude that genuine issues of material fact exist regarding G & M Farms' claim that Lindsay Manufacturing and DeKalb Agresearch, as Lindsay's parent company, failed to disclose material information regarding the Generation II lateral move irrigation system prior to the purchase of the system by G & M Farms. Accordingly, we reverse the summary judgment granted against defendants Lindsay Manufacturing and DeKalb Agresearch on this issue and remand for trial.

Although we hold that application of the clear and convincing evidence standard is not required in these summary judgment proceedings, and continue to adhere to the traditional Rule 56 standards, it must be kept in mind that the plaintiff must still prove the claims and allegations of fraud and intentional misrepresentation at trial by clear and convincing evidence. *Tusch Enters. v. Coffin,* 113 Idaho 37, 740 P.2d 1022 (1987); *Faw v. Greenwood,* 101 Idaho 387, 613 P.2d 1338 (1980); *Smith v. King,* 100 Idaho 331, 597 P.2d 217 (1979); *Gneit-*

*ing v. Clement,* 96 Idaho 348, 528 P.2d 1283 (1974).

### III.

### Dismissal of Negligent Misrepresentation Claim

In its sixth cause of action G & M Farms alleges that Lindsay Manufacturing Co., DeKalb Agresearch, Inc., and/or Funk Irrigation negligently misrepresented that the Generation II three-quarter mile wide irrigation system possessed the capacity and operational ability to meet the general and specific needs of G & M Farms. G & M Farms asserts that the defendants knew or should have known that this particular system lacked the requisite capacity and operational ability and could not meet the reasonable needs of G & M Farms.

In *Clark v. International Harvester,* 99 Idaho 326, 581 P.2d 784 (1978), this Court held in actions for purely economic loss arising from the sale of tangible personal property, that the Uniform Commercial Code "adequately define[s] the rights of the parties in such cases and the judicial expansion of negligence law to cover purely economic losses would only add more confusion in an area already plagued with overlapping and conflicting theories of recovery." 99 Idaho at 336, 581 P.2d at 794. This Court held in *Clark* that unless there was injury to persons or property as a result of the malfunction of a product, there was no justifiable reason for expanding tort law to cover purely economic losses, since such losses are recoverable under the Uniform Commercial Code.

In the instant case, G & M Farm's claim for negligent misrepresentation alleges that the defendants negligently failed to disclose that the irrigation system was not designed for its specific needs. G & M Farms alleges that it suffered economic loss in the form of reduced crop yield. A review of the pleadings contained in the record confirms that G & M Farms did not allege property damage. The remedy for a claim for purely economic damages falls within the implied warranty of fitness for a particular purpose under I.C. § 28–2–315. As such, the Uniform Commercial Code, and this Court's decision in *Clark v. International Harvester,* 99 Idaho 326, 581 P.2d 784 (1978), precludes a products liability action sounding in tort under these circumstances where there is no personal injury or damage to property alleged. Therefore, we affirm the trial court's dismissal of the negligent misrepresentation claim.

### IV.

### Conclusion

Based on our review of the entire record before us, and construing the facts in this case most favorably to G & M Farms, we reverse the partial summary judgments entered in favor of Lindsay Manufacturing and DeKalb Agresearch, Inc., as to the claim for intentional misrepresentation. We affirm the partial summary judgment in favor of Lindsay Manufacturing, DeKalb Agresearch and Funk Irrigation on the negligent misrepresentation claim.

The case is remanded for further proceedings consistent with this opinion. We award no attorney fees on appeal. Costs to appellant.

JOHNSON and McDEVITT, JJ., concur.

BAKES, Chief Justice, concurring specially:

I concur with all of the majority opinion except a small, but fairly important, part of the standard of review analysis dealing with the plaintiff's clear and convincing burden of proof. Since in this case it makes no difference whether you apply the clear and convincing evidence standard in these summary judgment proceedings or the preponderance of the evidence standard, the issue is probably moot. When the evidence is viewed most favorably toward G & M Farms, the party opposing summary judgment, under either standard "the moving party is [not] entitled to judgment as a matter of law," I.R.C.P. 56(c), and therefore this case must be remanded for a trial. Accordingly, I concur in the

Court's opinion with the following reservation.

As to the issue of whether or not the trial court should evaluate the evidence on summary judgment by the same standard which the plaintiff G & M Farms must prove at trial, it seems clear under Rule 56(c) and from our prior decision in *Weimer v. Rankin*, 117 Idaho 566, 790 P.2d 347 (1990), that the trial court should evaluate the evidence on summary judgment by the same standard which he must evaluate the evidence at trial in ruling on a motion for directed verdict. If at trial plaintiff must prove its case by clear and convincing evidence, as it must in this case, then the trial court in ruling on a motion for summary judgment should evaluate the evidence by the same standard. Admittedly, the evidence must be viewed most favorably to the non-moving party, and all conflicting evidence and inferences must be resolved in favor of the non-moving party. However, when that is done and when the evidence, viewed that way, still demonstrates that a directed verdict would have to be granted against a party at trial because he has not established his case by clear and convincing evidence (if it is the kind of a case which requires clear and convincing evidence) then summary judgment ought to be granted. *Weimer v. Rankin, supra.* Our decision in *Kline v. Clinton*, 103 Idaho 116, 645 P.2d 350 (1982), does not, in my view, hold otherwise. The holding of the Court in *Kline* was that, "[A]t the summary judgment stage the function of the trial court is not to weigh the evidence or to try the factual issues *by whatever standard is appropriate to the case*, but merely to determine whether or not there exists any genuine issue of material fact as adduced from the entire record." 103 Idaho at 121, 645 P.2d at 355 (emphasis added). If there are no factual disputes, or if the facts are disputed but nevertheless viewing the facts most favorably to the non-moving party the record still demonstrates that the plaintiff's evidence is insufficient to survive a directed verdict, then the standard of Rule 56(c) has been met and "the moving party is entitled to a judgment as a matter of law."

However, in this case, viewing the evidence most favorably to the plaintiff G & M Farms, and even applying the clear and convincing evidence standard, this record shows that the plaintiff G & M Farms' evidence would survive a directed verdict, and therefore it was improper for the trial court to grant summary judgment. Accordingly, I concur in the majority opinion.

BISTLINE, Justice, concurring in part and dissenting in part.

As to the majority's characterization of crop damage as economic damages, my vote is to concur but not with conviction or enthusiasm—but rather by way of giving some forewarning that future cases involving that philosophy will find me urging the Court to back away from denying damage awards in cases such as this—where recoverable economic losses are very often the major items of a plaintiff's total loss. As to the summary judgment issue, I concur in the result but am somewhat troubled by some of what has been written.

In his specially concurring opinion, specifically the second paragraph, Chief Justice Bakes today advances his view relative to summary judgment proceedings that "[i]f at trial plaintiff must prove its case by clear and convincing evidence, as it must in this case, then the trial court in ruling on a motion for summary judgment *should* evaluate the evidence by the same standard." (Emphasis added.) To that statement, add on this statement made just a few months earlier:

> 'There is no issue for trial unless there is sufficient evidence favoring the non-moving party for a jury to return a verdict for that party.' *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–50, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202, 209 (1986).

*R.G. Nelson, A.I.A. v. Steer*, 118 Idaho 409, 410, 797 P.2d 117, 118 (1990) (Bakes, C.J. writing for the majority). *Question: Put those two statements together and what do you have? Answer: Most plaintiffs turned out of court in summary judgment proceedings because of a failure to display clear and convincing evidence.*

Accordingly, now is the time to suggest that it is far better that the day does not arrive when the two statements become inexorably intertwined with each other.

Note was taken in *Nelson v. Steer* that "Justice Bakes may be seen as inadvertently inflicting great injustice on Hebener [a defendant in the suit along with Steer] by his misuse of *Anderson v. Liberty Lobby, Inc.*, for the proposition that: '[T]here is no issue for trial unless there is sufficient evidence favoring the non-moving party for a jury to return a verdict for that party.'" *Nelson*, 118 Idaho at 420, 797 P.2d at 128 (Bistline, J. dissenting) (citation omitted). To establish that misuse of *Anderson* it was only necessary to set out part of Justice Johnson's opinion in *Wiemer v. Rankin*, 117 Idaho 566, 790 P.2d 347 (1990), which was done. *Wiemer* pointed out clearly and concisely that the standard of proof made applicable to a summary judgment proceeding *in a defamation case* is clear and convincing evidence, but, only as to the single issue, namely the element of *actual malice.*

Concerned that Chief Justice Bakes might one day convert his views into a *holding*, the caveat was ventured that "[u]nless Justice Bakes reconsiders, he will be setting as precedent a new standard which trial courts will be obliged to apply in *all* summary judgment proceedings, assuming that he garners a majority, which he does almost invariably." *Nelson*, 118 Idaho at 421, 797 P.2d at 129. This particular occasion presents the opportunity of stating that at one time this Court was perilously close to issuing an opinion making the same mistake which Judge Winmill here made, namely that of applying to the summary judgment proceedings the *Anderson* standard for ruling on any motion for summary judgment, even though there be no issue whatsoever involving the element of *actual malice.*

In an attempt to avoid further confusion regarding the applicability of *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986), a short discussion of that opinion is in order. *Anderson* was described by one unconvinced justice as an "opinion [which] sounds much like a treatise about cooking by someone who has never cooked before and has no intention of starting now." *Anderson*, 477 U.S. at 269, 106 S.Ct. at 2521 (Rehnquist, J. dissenting). Indeed, *Anderson's* validity was questioned at the time of its issuance by two dissenting opinions, one authored by Justice Rehnquist and the other by Justice Brennan.[2] Both dissents reached the same conclusion, but by different routes. Justice Rehnquist writing for himself and the Chief Justice, declared that *"[t]he Court's decision to engraft the standard of proof applicable to a fact finder onto the law governing the procedural motion for summary judgment* (a motion that has always been regarded as raising a question of law rather than a question of fact), [citation omitted], *will do great mischief with little corresponding benefit."* *Anderson*, 477 U.S. at 272, 106 S.Ct. at 2522 (Rehnquist, J. dissenting) (emphasis added).

On cursory examination of *Anderson's* "new rule" designed by Justice Byron White for summary judgment proceedings it is seen at a glance, to Justice White's credit, that it was clearly limited to one category of controversy—defamation cases which involve public figures or public officials. The second paragraph of Justice White's majority opinion could not be more explicit:

> This case presents the question whether the clear-and-convincing-evidence requirement must be considered by a court ruling on a motion for summary judgment under Rule 56 of the Federal Rules of Civil Procedure in a case to which *New York Times* applies.

---

2. Given the great difference between the philosophies of these two scholarly justices, and the fact that both have given up their valuable time in writing separate dissenting opinions seeking to dissuade their fellow justices from recklessly charting a doubtful course, it would seem that reasoning members of this Court would be deeply worried about entering uncharted waters where hidden shoals lurk below. Moreover, that Chief Justice Burger fully concurred in Justice Rehnquist's dissent is, or should be, to most minds, the raising of the red flag which signals the need for extreme caution in proceeding any further.

*Anderson*, 477 U.S. at 244, 106 S.Ct. at 2508. As all should be aware, the case of *New York Times Co. v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), required that all public figure or public official plaintiffs pursuing defamation suits show *at trial* by clear and convincing evidence proof of actual malice.

In two successive paragraphs the Court's opinion states the rule as applied and the rule in general. The rule *as applied* states that:

> When determining if a genuine factual issue as to actual malice exists in a libel suit brought by a public figure, a trial judge must bear in mind the actual quantum and quality of proof necessary to support liability under *New York Times.* . . .

The rule *in general* is similar but much broader in scope, and is followed immediately by another statement of the rule as narrowly applied to the case:

> Thus, in ruling on a motion for summary judgment, the judge must view the evidence presented through the prism of the substantive evidentiary burden. This conclusion is mandated by the nature of this determination. The question here is whether a jury could reasonably find *either* that the plaintiff proved his case by the quality and quantity of evidence required by the governing law *or* that he did not. Whether a jury could reasonably find for either party, however, cannot be defined except by the criteria governing what evidence would enable the jury to find for either the plaintiff or the defendant: It makes no sense to say that a jury could reasonably find for either party without some benchmark as to what standards govern its deliberations and within what boundaries its ultimate decision must fall, and these standards and boundaries are in fact provided by the applicable evidentiary standards.

> Our holding that the clear-and-convincing standard of proof should be taken into account in ruling on summary judgment motions does not denigrate the role of the jury. It by no means authorizes

trial on affidavits. Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, whether he is ruling on a motion for summary judgment or for a directed verdict. The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor. *Adickes* [*v. S.H. Kress & Co.*], 398 U.S. [144] 158–59, 90 S.Ct. [1598] 1608–09 [26 L.Ed.2d 142 (1976)]. Neither do we suggest that the trial courts should act other than with caution in granting summary judgment or that the trial court may not deny summary judgment in a case where there is reason to believe that the better course would be to proceed to a full trial. *Kennedy v. Silas Mason Co.*, 334 U.S. 249, 68 S.Ct. 1031, 92 L.Ed. 1347 (1948).

> In sum, we conclude that the determination of whether a given factual dispute requires submission to a jury must be guided by the substantive evidentiary standards that apply to the case. This is true at both the directed verdict and summary judgment stages. Consequently, where the *New York Times* 'clear and convincing' evidence requirement applies, the trial judge's summary judgment inquiry as to whether a genuine issue exists will be whether the evidence presented is such that a jury applying that evidentiary standard could reasonably find for either the plaintiff or the defendant. Thus, where the factual dispute concerns actual malice, clearly a material issue in the *New York Times* case, the appropriate summary judgment question will be whether the evidence in the record could support a reasonable jury finding either that the plaintiff has shown actual malice by clear and convincing evidence or that the plaintiff has not.

*Anderson*, 477 U.S. at 254–55, 106 S.Ct. at 2513–14 (footnote omitted). The question before us is to what extent, if any, should the *Anderson* ratio decidendi be applied to a run-of-the-mill civil case (borrowing from the language of Justice White [3]), which

---

**3.** "Progressing to the specific issue in this case, we are convinced that the inquiry involved in a

comes before the trial court for its ruling in summary judgment proceedings in a *state* rather than a *federal court.* Otherwise stated, is this Court required by the High Court's pronouncement in *Anderson* to force off onto a plaintiff the burden of resisting a summary judgment motion by producing evidence that would meet the burden of being of such convincing clarity that any reasonable jury would find against the opposing party? As Justice Brennan explained:

> The Court's holding is not, of course, confined in its application to First Amendment cases. Although this case [*i.e., Anderson*] arises in the context of litigation involving libel and the press, the Court's holding is that 'in ruling on a motion for summary judgment, the judge must view the evidence presented through the prism of the substantive evidentiary burden.' 106 S.Ct. at 2513. Accordingly, I simply do not understand why Justice REHNQUIST, dissenting, feels it appropriate to cite *Calder v. Jones,* 465 U.S. 783, 104 S.Ct. 1482, 79 L.Ed.2d 804 (1984), and to remind the Court that we have consistently refused to extend special procedural protections to defendants in libel and defamation suits. The Court today does nothing of

the kind. <u>It changes summary judgment procedure for *all* litigants, regardless of the substantive nature of the underlying litigation.</u>

> ... [T]oday's decision by its terms applies to all summary judgment motions, irrespective of the burden of proof required and the subject matter of the suit.

*Anderson,* 477 U.S. at 257–58 n. 1, 106 S.Ct. at 2515 (Brennan, J. dissenting) (emphasis in original and added).

While Justice Brennan could not understand why Justice Rehnquist included *Calder v. Jones* in his dissent, state court trial judges and appellate justices surely read with relief that they were not required, as a matter of constitutional law, to consider the holding in *Anderson* as mandatorily prescribed in all defamation suits which necessarily implicate the First Amendment. With Chief Justice Burger joining it, the Rehnquist dissent begins with this observation:

> The Court, apparently moved by concerns for intellectual tidiness, mistakenly decides that the 'clear and convincing evidence' standard governing finders of fact in libel cases must be applied by trial courts in deciding a motion for summary judgment in such a case.[4]

---

ruling on a motion for summary judgment or for a directed verdict necessarily implicates the substantive evidentiary standard of proof that would apply at the trial on the merits. If the defendant in a *run-of-the-mill* civil case moves for summary judgment or for a directed verdict based on the lack of proof of a material fact, the judge must ask himself *not whether he thinks the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented."* *Anderson, id.* at 252, 106 S.Ct. at 2512 (emphasis added).

4. Justice Brennan did not fail to observe in his opinion that although "[t]he Court's opinion is replete with boilerplate language to the effect that trial courts are not to weigh evidence when deciding summary judgment motions ... the Court's opinion is also full of language which could surely be understood as an invitation—if not an instruction—to trial courts to assess and weigh evidence much as a juror would:

> 'When determining if a genuine factual issue ... exists ..., a trial judge must *bear in mind the actual quantum and quantity* of proof necessary to support liability.... For example, *there is no genuine issue if the evidence*

*presented in the opposing affidavits is of insufficient caliber or quality* to allow a rational finder of fact to find actual malice by clear and convincing evidence.' Ante, 106 S.Ct. at 2513 (emphasis added).

'[T]he inquiry ... [is] whether the evidence presents a *sufficient* disagreement to require submission to a jury or whether *it is so one-sided* that one party must prevail as a matter of law.' Ante, 106 S.Ct. at 2512 (emphasis added).

'[T]he judge must ask himself ... whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented. The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff.' *Ibid. Anderson,* 477 U.S. at 265–66, 106 S.Ct. at 2519 (Brennan, J. dissenting) (emphasis in original).

Justice Brennan, to his ever-lasting credit, and may our memories never fail us, made such a pile of mincemeat out of the Court's ration decidendi, that one can only wonder at the lack of perspicuity displayed by the justices who joined Justice White's opinion. It

The Court refers to this as a 'substantive standard,' but I think it is actually a procedural requirement engrafted onto Rule 56, contrary to our statement in *Calder v. Jones,* 465 U.S. 783, 104 S.Ct. 1482, 79 L.Ed.2d 804 (1984), that

> [w]e have already declined in other contexts to grant special procedural protections to defendants in libel and defamation actions in addition to the constitutional protections embodied in the substantive laws. *Id.,* at 790–91, 104 S.Ct. at 1487–88.

*Anderson,* 477 U.S. at 268–69, 106 S.Ct. at 2520–21 (Rehnquist, J. dissenting) (footnote added). This Court was free to follow *Anderson* or to leave it be. No federal constitutional mandate required this Court (or any other state court) to engraft the *Anderson* holding onto its defamation case law, and nothing at all required us to construe our Rule 56 just like the federal interpretation of the Federal Rules of Civil Procedure.

It is of interest that two states have already decided to disregard *Anderson.* Consider, for example, this discussion of what the Alaska Supreme Court decided to do with *Anderson*—put it aside:

> The malice standard was more fully discussed in an earlier decision, *Moffat[t] v. Brown* [751 P.2d 939 (Alaska 1988)], in which the court reaffirmed the requisite mental state for a finding of malice in libel actions as reckless disregard sufficient to permit the inference that the defendant "subjectively entertained serious doubts as to the truth of his statement." More importantly, perhaps, in *Moffat[t]*, the court declined to follow the United States Supreme Court's standard for summary judgment in libel cases, enunciated in *Anderson v. Liberty Lobby, Inc.,* of whether the evidence supports a finding "that the plaintiff has shown actual malice by clear and convincing evidence or that the plaintiff has not." On the grounds that *Anderson* was "a case about federal procedure," the court instead elected to continue its own standard for denial of motions for summary judgment that "a genuine issue of material fact exists to be litigated." The court's reasoning was based on the belief that the *Anderson* standard requires a weighing of the evidence by the judge, a function which intrudes into the province of the jury.

Note, *The Year in Review,* 6 Alaska L.Rev. 1, 70 (1989) (footnotes omitted). *See also Berner v. Caldwell,* 543 So.2d 686 (Ala. 1989) (expressly rejecting the *Anderson* summary judgment standard).

So far, this Court's use of *Anderson* has been very limited, probably because of the paucity of defamation cases which arise in Idaho. *Anderson* does appear in the defamation case, *Wiemer v. Rankin,* 117 Idaho 566, 790 P.2d 347 (1990). Justice Johnson in authoring the opinion for the Court adopted only the narrow holding of *Anderson,* by prefacing his quote from *Anderson* with these words: "The Supreme Court has announced the standard to be applied in ruling on a motion for summary judgment in a defamation case in which actual malice must be proved." *Wiemer,* 117 Idaho at 574, 790 P.2d at 355.

Even though some small trouble was experienced with the authority cited in *Wiemer* in support of the principle that defamation defendants are accorded some special protections, the idea that proof of defamation should be sure and certain strikes close to what I believe is an important idea in our jurisprudence. This is especially true whenever private figure plaintiffs are involved because, as *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974) recognized, public figure plaintiffs by definition have ready ac-

---

was *not* a sound opinion. That three justices would feel obliged to register stinging dissents (Burger, J., joined the dissenting opinion of Rehnquist, J.) should not, however, suffice as reason for rejecting the opinion without studying it thoroughly. Having done just that, this time far more so than at the time of *Wiemer,* and then more recently at the time of *Nelson,* it is readily seen that all of the shortcomings of *Anderson* as exposed and discussed in the dissenting opinions are well substantiated. In fact, the criticism made therein borders on the extremely moderate. In short, it is an opinion which should not be allowed any more import beyond that which is imposed on federal courts by federal rules.

cess to the media as a forum whereat refutation of libelous assertions can be made, a forum which is not open to private figures who have been defamed.

The next use of *Anderson* occurred in *R.G. Nelson, A.I.A. v. Steer*, 118 Idaho 409, 797 P.2d 117 (1990). *Nelson* was not, however, a defamation action. Notwithstanding *Anderson's* inapplicability, an unenlightened majority seized upon this wholly innocuous civil controversy as a vehicle to help along the promotion of a heightened burden for all litigants resisting motions for summary judgment. The majority utilized a full paragraph to discuss the standard for reviewing a summary judgment motion—a readily obvious springboard from which to further a likely goal of fostering a new and different rule whereby plaintiffs can be ousted out of the courtroom before they make it past the threshold:

> It is not the judge's function to weigh evidence, 'but to determine whether there is a genuine issue for trial.... [T]here is no issue for trial unless there is sufficient evidence favoring the non-moving party for a jury to return a verdict for that party.' *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–50, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202, 209 (1986). Summary judgment should be granted if the evidence in opposition to the motion 'is merely colorable' or 'is not significantly probative.' *Id.*

*Nelson*, 118 Idaho at 410, 797 P.2d at 118. My dissent from *Nelson* was in part on the ground that this Court had just previously utilized *Anderson* for limited use in summary judgment *only* in defamation suits in which actual malice must be proved. In fact, I commended the author of *Wiemer* for having called *Anderson* to the attention of the bench and bar. That accolade was premised upon the acknowledgement that proof of actual malice was an element appropriate for use in defamation cases involving *public figure* plaintiffs.

The one *good* aspect of *Nelson's* use of *Anderson* was that it *did not* explicitly require of a court that it consider the evidentiary standard to be used *at trial* in making its ruling on a defendant's summary judgment motion. Better yet, *Nelson* did not quote from that part of *Anderson* which commands such a consideration. My *Nelson* opinion also pointed to my belief that any misuse of *Anderson* was inadvertent.

In reflecting on the history of the evolution of the well worn, tried and true summary judgment standard, I am reminded of Justice Brennan's appropriately wise comment:

> In my view, the Court's result [in *Anderson* ] is the product of an exercise akin to the child's game of 'telephone,' in which a message is repeated from one person to another and then another; after some time, the message bears little resemblance to what was originally spoken. In the present case, the Court purports to restate the summary judgment test, but with each repetition, the original understanding is increasingly distorted.

*Anderson*, 477 U.S. at 264–65, 106 S.Ct. at 2518 (Brennan, J. dissenting). This Court in *Wiemer* recognized *Anderson* as being applicable only to defamation suits, which necessarily involved actual malice. This Court used *Anderson* in *Nelson* purportedly *to repeat again the standard for summary judgment in general, but did not quote from the portions of *Anderson* which offend the common understanding of that standard. Hopefully, the day shall never come when this Court uses *Anderson* as a cornerstone for adopting it as an improved and preferred summary judgment standard for all cases.

The issue as to which I concur with reservation was not accorded adequate attention by the majority. Primarily, I am not persuaded that damages to crops are always *economic* damages that are not recoverable in tort in Idaho. Other states have not been all that hasty to so rule. While a case from Texas does support the construction that damages to crops are an economic loss and that tort theories are therefore not available to redress this

wrong,[5] courts in other states have made a scholarly approach to that issue.

Consider, for example:

When a product fails to perform properly, the buyer may incur one or more of three kinds of harm: personal injury, property damage, or economic loss. The term 'personal injury' is self-explanatory. Property damage consists of injury to the plaintiff's property other than to the product itself. Economic loss may be either direct or consequential. Direct economic loss occurs when a product damages itself or is unfit for the purpose for which it was sold. Such losses are generally limited to the price of the product. Consequential economic loss consists of an injury extrinsic to the product, such as lost profits or the loss of use of the product. See Note, Manufacturer's Strict Tort Liability to Consumers for Economic Loss, 41 St. John's L.Rev. 401 (1967).

As we observed above, the plaintiff's complaint alleges only economic loss—cost of repairs (direct economic loss) and loss of use of the product (consequential economic loss). In dismissing the plaintiff's counts alleging strict liability in tort, negligence, and misrepresentation, the trial court specifically relied upon the Second District's decision in *Alfred N. Koplin & Co. v. Chrysler Corp.* (1977), 49 Ill.App.3d 194, 7 Ill.Dec. 113, 364 N.E.2d 100. In that case, the plaintiff alleged negligent manufacture and breach of warranty and sought recovery for its expenses in repairing and replacing air conditioning units manufactured by the defendant. The court said the plaintiff's allegation of solely economic loss placed the case within the 'narrow range of situations dividing tort theory from contract theory. * * * The line of demarcation between physical harm and economic loss in our view reflects the line of demarcation between tort theory and contract theory.' (49 Ill.App.3d 194, 199, 7 Ill.Dec. 113, 116–17, 364 N.E.2d 100, 103–04.) The court then proceeded

to discuss cases which have divided on the question of whether economic loss should be recoverable in strict liability in tort absent any personal injury or property damage. Although the only tort count before it was the negligence count, the *Koplin* court purported to deny recovery for pure economic loss in any kind of tort action. Thus, the court's discussion is *dictum* as it relates to strict liability in tort and to misrepresentation.

The only other Illinois case facing the issue of recovery for purely economic loss in a tort action appears to be the First District's decision in *Rhodes Pharmacal Co. v. Continental Can Co.* (1966), 72 Ill.App.2d 362, 219 N.E.2d 726. The plaintiff in *Rhodes* was a marketer of drugs, cosmetics, and hair beauty products. It sought recovery for damages incurred because aerosol cans manufactured by the defendant had leaked. Without explanation, the court merely stated that the case did not meet the requirements for application of the strict liability in tort doctrine. Since the *Rhodes* court did not discuss the many policy issues on each side of the question we now face, the opinion is not persuasive, and we do not feel compelled to follow it. *Wanderer v. Plainfield Carton Corp.* (1976), 40 Ill.App.3d 552, 351 N.E.2d 630.

. . . .

In products liability actions in which the plaintiff has suffered either personal injury or property damage, courts have generally also allowed recovery for economic losses. (See generally *Suvada* [*v. White Motor Co.* (1965) 32 Ill.2d 612, 210 N.E.2d 182]; *141 South Main, Inc. v. Magic Fingers, Inc.* (1977), 49 Ill.App.3d 724, 7 Ill.Dec. 444, 364 N.E.2d 605; *Hales v. Green Colonial, Inc.* (8th Cir. 1974), 490 F.2d 1015.) To deny recovery for economic loss under strict liability in tort when there is no accompanying personal injury or property damage is an arbitrary distinction leading to opposite

---

**5.** *See Lockwood Corp. v. Spencer,* 613 S.W.2d 369 (Tex.Civ.App.1981) (crop damage, caused by defective irrigation system, is an economic loss).

results in cases that are virtually indistinguishable. In the instant case, had the plaintiff alleged that a mere bushel of corn had been destroyed by rain water leaking into the tank through the crack, then it would have suffered property damage sufficient to allow recovery of economic loss. Likewise, if an individual had cut his finger while inspecting the crack in the tank, he would have suffered a personal injury allowing recovery for all types of harm.

*Moorman Mfg. Co. v. National Tank Co.,* 92 Ill.App.3d 136, 47 Ill.Dec. 186, 189–91, 414 N.E.2d 1302, 1305–07 (1980). The Illinois court, in considering negligence, came across the case cited by today's majority, *Clark v. International Harvester,* 99 Idaho 326, 581 P.2d 784 (1978):

> With the growth of the strict liability in tort doctrine, negligence has been left to the backwaters of products liability law. Traditionally, courts did not allow recovery in negligence for economic losses absent personal injury or property damage. (*Wyatt v. Cadillac Motor Car Division* (1956), 145 Cal.App.2d 423, 302 P.2d 665; *Trans World Airlines v. Curtiss–Wright Corp.* (1955), 1 Misc.2d 477, 148 N.Y.S.2d 284.) However, even *Wyatt,* a leading case for the proposition that a manufacturer does not have a duty to avoid causing a buyer economic loss, has been limited by subsequent cases. See *Stewart v. Cox* (1961), 55 Cal.2d 857, 13 Cal.Rptr. 521, 362 P.2d 345, wherein the court said a contractor who built a swimming pool was liable for economic loss caused by the fact that the pool leaked.
>
> In the recent case of *Clark v. International Harvester Co.* (1978), 99 Idaho 326, 581 P.2d 784, the court denied recovery under negligence for a custom farmer's lost income while his tractor, manufactured by the defendant, was being repaired. The court used the same rationale as have courts denying such recovery under strict liability in tort—the UCC's preemption of such cases. *We reject, however, that basis for denying recovery under negligence,* just as we did under strict liability in tort.

> We agree with the courts in *Berg v. General Motors Corp.* (1976), 87 Wash.2d 584, 555 P.2d 818, and *State ex rel. Western Seed Production Corp. v. Campbell* (1968), 250 Or. 262, 442 P.2d 215, which held that a buyer's suit in negligence against a manufacturer should be limited, like any other negligence action, *only by the factors of proximate cause and foreseeability, not by the kind of harm the plaintiff has incurred.* We note that the court in *Berwind Corp. v. Litton Industries, Inc.* (7th Cir.1976), 532 F.2d 1, applying Illinois law, allowed recovery for negligent manufacture absent either personal injury or property damage. The court did not, however, discuss the fact that some courts do not allow such recovery. Rather, it determined the plaintiff's right to recovery by looking only to foreseeability and proximate cause.

> Our analysis under strict liability in tort has already pierced the veil of the contract/tort distinction relied upon by the court in *Koplin.* For the same reasons enunciated above, we hold that the plaintiff in this case can recover for economic loss under its negligence count.

*Moorman Mfg. Co.,* 47 Ill.Dec. at 195, 414 N.E.2d at 1311 (emphasis added). It is believed that many are the members of the trial bench and bar who would welcome an updated discussion and reconsideration by the justices of this Court of the economic issues as treated by *Moorman.*

A case from Iowa brings out similar concerns:

> We believe that when distinguishing between economic loss and property damage which will allow compensation the reason for the distinction must be kept in mind. The court emphasizes that there must be a closer connection between the injured party and the defendant than tangential economic losses. The plaintiff must own the property. This situation is unlike that of *Nebraska Innkeepers* [*v. Pittsburgh–Des Moines Corp.,* 345 N.W.2d 124 (Iowa 1984)] where the plaintiffs are only tenuously connected to the cause of action. Here the plaintiff

owned the crop and was directly damaged because his crop was not as large as it should have been. *Simply because the damage is measured in terms of potential sale of the crop if it had grown as it should does not automatically mean that the damage is economic.* Damages for loss of cattle would also be measured in terms of the amount of money they would have brought if sold for slaughter. *See, e.g., Denman v. Armour Pharmaceutical Co.,* 322 F.Supp. 1370, 1373 (N.D.Miss.1970). We agree with the trial court that the damage suffered by the plaintiff to his crop was property damage and not the indirect purely economic damage of the type condemned in *Nebraska Innkeepers* and *Van Wyk* [*v. Norden Laboratories, Inc.,* 345 N.W.2d 81 (Iowa 1984)].

*Manning v. International Harvester Co.,* 381 N.W.2d 376, 378–79 (Iowa Ct.App.1985) (emphasis added).

Finally, a New York case also refers to Idaho case law:

The law is now settled in New York that if the loss of plaintiff's crops and the consequential damages resulting therefrom are 'economic damages,' plaintiff cannot recover (see *Schiavone Constr. Co. v. Elgood Mayo Corp.,* 81 A.D.2d 221, 227, 439 N.Y.S.2d 933, revd. for the reasons stated in dissenting opn., Silverman, J., 56 N.Y.2d 667, 451 N.Y. S.2d 720, 436 N.E.2d 1322, supra; *Hole v. General Motors Corp.,* 83 A.D.2d 715, 442 N.Y.S.2d 638; *Dudley Constr. v. Drott Mfg. Co.,* 66 A.D.2d 368, 372–375, 412 N.Y.S.2d 512). The Court of Appeals in its reversal in *Schiavone* on the rationale of the dissenting opinion at the Appellate Division (81 A.D.2d 221, 227–234, 439 N.Y.S.2d 933) has necessarily rejected the contrary view in *Santor v. A & M Karagheusian, Inc.,* 44 N.J. 52, 207 A.2d 305, and embraced the majority rule as stated by Chief Justice Traynor in *Seely v. White Motor Co.,* 63 Cal.2d 9, 18, 45 Cal.Rptr. 17, 403 P.2d 145: 'The distinction that the law has drawn between tort recovery for physical injuries and warranty recovery for economic loss is not arbitrary and does not rest on the "luck"

of one plaintiff in having an accident causing physical injury. The distinction rests, rather, on an understanding of the nature of the responsibility a manufacturer must undertake in distributing his products. He can appropriately be held liable for physical injuries caused by defects by requiring his goods to match a standard of safety defined in terms of conditions that create unreasonable risks of harm. *He cannot be held for the level of performance of his products in the consumer's business unless he agrees that the product was designed to meet the consumer's demands'* (emphasis added). The *Seely* rule applies whether the damages are sought under a strict products or negligence theory (*Seely v. White Motor Co.,* supra, 63 Cal.2d at p. 18, 45 Cal.Rptr. 17, 403 P.2d 145; see *Hole v. General Motors Corp.,* supra; *S.M. Wilson & Co. v. Smith Intern., Inc.,* 587 F.2d 1363 [CCA 9th, 1978], supra; *Clark v. International Harvester Co.,* 99 Idaho 326, 332–336, 581 P.2d 784, supra).

*Cayuga Harvester v. Allis–Chalmers Corp.,* 95 A.D.2d 5, 465 N.Y.S.2d 606, 620 (1983) (footnote omitted). These statements from other courts are provided to suggest that this Court should avoid getting caught up in technical distinctions instead of concerning itself with the underlying basis of a damaged party's claim for relief.

In conclusion, it is noted that on an almost regular basis we are exposed to the written decisions of the district courts, and as a generality all are well written. Some are more thorough than others, and Judge Winmill's written decision here exemplifies those which are outstanding as to writing ability and detailed attention to all of the issues, which in this case, as pointed out by Justice Boyle, are many and not simple.

In twenty-five pages, Judge Winmill discusses all of the issues, and necessarily rules when confronted with a conflict in the evidence, but always with a bent toward applying the law which is available and applicable. Of interest, Judge Winmill, as does Justice Boyle, demonstrated his awareness of the *Anderson* case from the

High Court. Judge Winmill cites an Idaho case, *Sharp v. Idaho Inv. Corp.,* 95 Idaho 113, 121, 504 P.2d 386, 394 (1972), as authority for "this elevated standard of proof." R. 457. In that regard, there was a misreading of the *Sharp* case. *Sharp* requires only that *at trial,* a plaintiff's burden is to establish all nine of the essential elements of fraud by evidence which is clear and convincing.

## ATTACHMENT A

## INDEMNITY AGREEMENT

THIS Indemnity Agreement, made and entered into this 22 day of August, 1984, by and between LINDSAY MANUFACTURING COMPANY, a Corporation, of Lindsay, Nebraska, hereinafter referred to as "Lindsay", and FUNK IRRIGATION of American Falls, Idaho, hereinafter referred to as "Funk".

WHEREAS, Lindsay is the manufacturer of certain irrigation equipment including equipment known as lateral move enclosed pipeline systems, and

WHEREAS, Funk desires to purchase two of said lateral move enclosed pipeline systems for resale to a customer of Funk, and

WHEREAS, Lindsay has not designed said system for the length requested by Funk and the same is not designed to operate on slopes as severe as those that the customer of Funk intends to operate said system on, and

WHEREAS, Lindsay has advised Funk of these facts and has advised Funk that Lindsay personnel will not be available during the next several months to work on the machines and assist in keeping them operational, and

WHEREAS, Lindsay has advised Funk that certain operational characteristics of the equipment have been discovered and have not yet been corrected that may effect the operation of said equipment under normal operating conditions, and

WHEREAS, Funk has indicated that it desires to purchase said equipment, notwithstanding the above facts, and that Funk will do the work necessary to erect and keep said systems operational, and

WHEREAS, Lindsay is willing to sell the same to Funk only upon condition that Funk indemnify and hold harmless Lindsay from any claim of damages that may result from the above, and

WHEREAS, Funk is willing to purchase said equipment, indemnifying Lindsay from loss pursuant to terms and conditions hereof,

NOW THEREFORE, in consideration of Lindsay agreeing to sell said equipment to Funk and the further mutual covenants and agreements herein contained, the parties agree as follows:

1. Lindsay agrees to make the sale of said irrigation equipment to Funk upon the terms and conditions set forth in this Indemnity Agreement.

2. Funk does hereby indemnify Lindsay against all actions, proceedings, claims, demands, costs, damages and expenses to which Lindsay may be subjected by reason of the fact that the irrigation equipment sold hereunder is longer than the length recommended by Lindsay and by reason of the fact that the same will be operating on slopes more severe than those recommended by Lindsay, and by reason of the fact that Lindsay will be unable to provide Lindsay service personnel to work on any problems that might develop with the equipment.

3. In entering into this Indemnity Agreement, Funk understands that the above conditions may cause the system to misalign and shut down and may cause operational problems and Funk is willing to assume the responsibility therefor, without any right to look to Lindsay for any claims or damages. In the event the customer of Funk asserts any such claims or damages resulting from the conditions set forth in this Indemnity Agreement, then Funk will fully indemnify Lindsay therefrom.

4. Funk further understands that the operational characteristics of the equipment that have been discovered that effect the operation of the equipment under normal operating conditions have not yet been corrected. Funk is willing to assume the

responsibility therefor without any right to look to Lindsay for claims or damages, the same being specifically released and Funk indemnifies Lindsay for any claims or damages that may be asserted by Funk's customer against Lindsay. If Lindsay is able to isolate and correct said operational difficulties, Lindsay will retrofit said systems covered under this agreement with any corrective measures determined by Lindsay to be useful in correcting said operational difficulties.

5. The standard warranties set forth in the Lindsay Sales Agreement will remain in full force and effect as to this sale, except as limited herein. In the event Lindsay is able to do a retrofit of said systems, as set forth in paragraph 4 hereof, then the standard warranties will apply to the operation of the equipment under normal operating conditions.

IN WITNESS WHEREOF, the parties hereto have executed this Indemnity Agreement the date first above written.

LINDSAY MANUFACTURING COMPANY

By: Robert S. Snoopy

FUNK IRRIGATION

By: GR Toevs

## ATTACHMENT B

## INDEMNITY AGREEMENT

THIS Indemnity Agreement, made and entered into this 29 day of January, 1985 by and between LINDSAY MANUFACTURING COMPANY, a Corporation, of Lindsay, Nebraska, hereinafter referred to as "Lindsay", and FUNK IRRIGATION of American Falls, Idaho, hereinafter referred to as "FUNK".

WHEREAS Lindsay is the manufacturer of certain irrigation equipment including equipment known as lateral move enclosed pipeline systems, and

WHEREAS, Funk desires to purchase said lateral move enclosed pipeline system for resale to a customer of Funk, and

WHEREAS, Lindsay has not designed said system for the length requested by Funk, and

WHEREAS, Lindsay has advised Funk of this fact and has advised Funk that Lindsay personnel will not be available during the next several months to work on the machines and assist in keeping them operational, and

WHEREAS, Funk has indicated that it desires to purchase said equipment, notwithstanding the above facts, and that Funk will do the work necessary to erect and keep said system operational, and

WHEREAS, Lindsay is willing to sell the same to Funk only upon condition that Funk indemnify and hold harmless Lindsay from any claim of damages that may result from the above, and

WHEREAS, Funk is willing to purchase said equipment, indemnifying Lindsay from loss pursuant to terms and conditions hereof,

NOW, THEREFORE, in consideration of Lindsay agreeing to sell said equipment to Funk and the further mutual covenants and agreements herein contained, the parties agree as follows:

1. Lindsay agrees to make the sale of said irrigation equipment to Funk upon the terms and conditions set forth in this Indemnity Agreement.

2. Funk does hereby indemnify Lindsay against all actions, proceedings, claims, demands, costs, damages and expenses to which Lindsay may be subjected by reason of the fact that the irrigation equipment sold hereunder is longer than the length recommended by Lindsay, and by reason of the fact that Lindsay will be unable to provide Lindsay service personnel to work on any problems that might develop with the equipment.

3. In entering into this Indemnity Agreement, Funk understands that the above conditions may cause the system to misalign and shut down and may cause operational problems and Funk is willing to assume the responsibility therefor, without any right to look to Lindsay for any claims or damages. In the event the customer of Funk asserts any such claims or damages

resulting from the conditions set forth in this Indemnity Agreement, then Funk will fully indemnify Lindsay therefrom.

4. The standard warranties set forth in the Lindsay Sales Agreement will remain in full force and effect as to this sale, except as limited herein.

This agreement is effected on system to be sold to G & M Farms by Funk Irrigation as ordered on ZL–___.

IN WITNESS WHEREOF, the parties hereto have executed this Indemnity Agreement the date first above written.

LINDSAY MANUFACTURING COMPANY

By: Robert S. Snoopy

FUNK IRRIGATION

By: GR Toevs